(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CEDAR POINT NURSERY ET AL. *v.* HASSID ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 20–107.  Argued March 22, 2021—Decided June 23, 2021

A California regulation grants labor organizations a "right to take access" to an agricultural employer's property in order to solicit support for unionization.  Cal. Code Regs., tit. 8, §20900(e)(1)(C).  The regulation mandates that agricultural employers allow union organizers onto their property for up to three hours per day, 120 days per year.  Organizers from the United Farm Workers sought to take access to property owned by two California growers—Cedar Point Nursery and Fowler Packing Company.  The growers filed suit in Federal District Court seeking to enjoin enforcement of the access regulation on the grounds that it appropriated without compensation an easement for union organizers to enter their property and therefore constituted an unconstitutional *per se* physical taking under the Fifth and Fourteenth Amendments.  The District Court denied the growers' motion for a preliminary injunction and dismissed the complaint, holding that the access regulation did not constitute a *per se* physical taking because it did not allow the public to access the growers' property in a permanent and continuous manner.  A divided panel of the Court of Appeals for the Ninth Circuit affirmed, and rehearing en banc was denied over dissent.

*Held*: California's access regulation constitutes a *per se* physical taking. Pp. 4–20.

   (a) The growers' complaint states a claim for an uncompensated taking in violation of the Fifth and Fourteenth Amendments.  Pp. 4–17.

      (1) The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." When the government physically acquires private property for a public use, the Takings Clause obligates the government to provide the owner

Syllabus

with just compensation. *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 321. The Court assesses such physical takings using a *per se* rule: The government must pay for what it takes. *Id.*, at 322.

A different standard applies when the government, rather than appropriating private property for itself or a third party, instead imposes regulations restricting an owner's ability to use his own property. *Id.*, at 321–322. To determine whether such a use restriction amounts to a taking, the Court has generally applied the flexible approach set forth in *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, considering factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action. *Id.*, at 124. But when the government physically appropriates property, *Penn Central* has no place—regardless whether the government action takes the form of a regulation, statute, ordinance, or decree. Pp. 4–7.

(2) California's access regulation appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking. Rather than restraining the growers' use of their own property, the regulation appropriates for the enjoyment of third parties (here union organizers) the owners' right to exclude. The right to exclude is "a fundamental element of the property right." *Kaiser Aetna* v. *United States*, 444 U. S. 164, 179–180. The Court's precedents have thus treated government-authorized physical invasions as takings requiring just compensation. As in previous cases, the government here has appropriated a right of access to private property. Because the regulation appropriates a right to physically invade the growers' property—to literally "take access"—it constitutes a *per se* physical taking under the Court's precedents. Pp. 7–10.

(3) The view that the access regulation cannot qualify as a *per se* taking because it does not allow for permanent and continuous access 24 hours a day, 365 days a year is insupportable. The Court has held that a physical appropriation is a taking whether it is permanent or temporary; the duration of the appropriation bears only on the amount of compensation due. See *United States* v. *Dow*, 357 U. S. 17, 26. To be sure, the Court in *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, discussed the heightened concerns associated with "[t]he permanence and absolute exclusivity of a physical occupation" in contrast to "temporary limitations on the right to exclude," and stated that "[n]ot every physical *invasion* is a taking." *Id.*, at 435, n. 12. But the regulation here is not transformed from a physical taking into a use restriction just because the access granted is restricted to union organizers, for a narrow purpose, and for a limited time. And although the

Board disputes whether the access regulation appropriates an easement as defined by California law, it cannot absolve itself of takings liability by appropriating the growers' right to exclude in a form that is a slight mismatch from state property law.

*PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, does not cut against the Court's conclusion that the access regulation constitutes a *per se* taking. In *PruneYard* the California Supreme Court recognized a right to engage in leafleting at the PruneYard, a privately owned shopping center, and the Court applied the *Penn Central* factors to hold that no compensable taking had occurred. 447 U. S., at 78, 83. *PruneYard* does not establish that limited rights of access to private property should be evaluated as regulatory rather than *per se* takings. Restrictions on how a business generally open to the public such as the PruneYard may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public. Pp. 10–15.

(4) The Court declines to adopt the theory that the access regulation merely regulates, and does not appropriate, the growers' right to exclude. The right to exclude is not an empty formality that can be modified at the government's pleasure. Pp. 15–17.

(b) The Board's fear that treating the access regulation as a *per se* physical taking will endanger a host of state and federal government activities involving entry onto private property is unfounded. First, the Court's holding does nothing to efface the distinction between trespass and takings. The Court's precedents make clear that isolated physical invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts rather than appropriations of a property right. Second, many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights, including traditional common law privileges to access private property. See *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1028–1029. Third, the government may require property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking. Under this framework, government health and safety inspection regimes will generally not constitute takings. In this case, however, none of these considerations undermine the Court's determination that the access regulation gives rise to a *per se* physical taking. Pp. 17–20.

923 F. 3d 524, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. KAVANAUGH, J., filed a concurring opinion. BREYER, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–107

CEDAR POINT NURSERY, ET AL., PETITIONERS *v.*
VICTORIA HASSID, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 23, 2021]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

A California regulation grants labor organizations a "right to take access" to an agricultural employer's property in order to solicit support for unionization. Cal. Code Regs., tit. 8, §20900(e)(1)(C) (2020). Agricultural employers must allow union organizers onto their property for up to three hours per day, 120 days per year. The question presented is whether the access regulation constitutes a *per se* physical taking under the Fifth and Fourteenth Amendments.

I

The California Agricultural Labor Relations Act of 1975 gives agricultural employees a right to self-organization and makes it an unfair labor practice for employers to interfere with that right. Cal. Lab. Code Ann. §§1152, 1153(a) (West 2020). The state Agricultural Labor Relations Board has promulgated a regulation providing, in its current form, that the self-organization rights of employees include "the right of access by union organizers to the premises of an agricultural employer for the purpose of meeting and talking with employees and soliciting their support." Cal. Code

Regs., tit. 8, §20900(e).  Under the regulation, a labor organization may "take access" to an agricultural employer's property for up to four 30-day periods in one calendar year. §§20900(e)(1)(A), (B).  In order to take access, a labor organization must file a written notice with the Board and serve a copy on the employer.  §20900(e)(1)(B).  Two organizers per work crew (plus one additional organizer for every 15 workers over 30 workers in a crew) may enter the employer's property for up to one hour before work, one hour during the lunch break, and one hour after work. §§20900(e)(3)(A)–(B), (4)(A).  Organizers may not engage in disruptive conduct, but are otherwise free to meet and talk with employees as they wish.  §§20900(e)(3)(A), (4)(C).  Interference with organizers' right of access may constitute an unfair labor practice, §20900(e)(5)(C), which can result in sanctions against the employer, see, *e.g.*, *Harry Carian Sales* v. *Agricultural Labor Relations Bd.*, 39 Cal. 3d 209, 231–232, 703 P. 2d 27, 42 (1985).

Cedar Point Nursery is a strawberry grower in northern California.  It employs over 400 seasonal workers and around 100 full-time workers, none of whom live on the property.  According to the complaint, in October 2015, at five o'clock one morning, members of the United Farm Workers entered Cedar Point's property without prior notice.  The organizers moved to the nursery's trim shed, where hundreds of workers were preparing strawberry plants. Calling through bullhorns, the organizers disturbed operations, causing some workers to join the organizers in a protest and others to leave the worksite altogether.  Cedar Point filed a charge against the union for taking access without giving notice.  The union responded with a charge of its own, alleging that Cedar Point had committed an unfair labor practice.

Fowler Packing Company is a Fresno-based grower and shipper of table grapes and citrus.  It has 1,800 to 2,500

employees in its field operations and around 500 in its packing facility. As with Cedar Point, none of Fowler's workers live on the premises. In July 2015, organizers from the United Farm Workers attempted to take access to Fowler's property, but the company blocked them from entering. The union filed an unfair labor practice charge against Fowler, which it later withdrew.

Believing that the union would likely attempt to enter their property again in the near future, the growers filed suit in Federal District Court against several Board members in their official capacity. The growers argued that the access regulation effected an unconstitutional *per se* physical taking under the Fifth and Fourteenth Amendments by appropriating without compensation an easement for union organizers to enter their property. They requested declaratory and injunctive relief prohibiting the Board from enforcing the regulation against them.

The District Court denied the growers' motion for a preliminary injunction and granted the Board's motion to dismiss. The court rejected the growers' argument that the access regulation constituted a *per se* physical taking, reasoning that it did not "allow the public to access their property in a permanent and continuous manner for whatever reason." *Cedar Point Nursery* v. *Gould*, 2016 WL 1559271, *5 (ED Cal., Apr. 18, 2016) (emphasis deleted). In the court's view, the regulation was instead subject to evaluation under the multifactor balancing test of *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104 (1978), which the growers had made no attempt to satisfy. *Cedar Point Nursery* v. *Gould*, 2016 WL 3549408, *4 (ED Cal., June 29, 2016).

A divided panel of the Court of Appeals for the Ninth Circuit affirmed. The court identified three categories of regulatory actions in takings jurisprudence: regulations that impose permanent physical invasions, regulations that de-

prive an owner of all economically beneficial use of his prop-
erty, and the remainder of regulatory actions. *Cedar Point
Nursery* v. *Shiroma*, 923 F. 3d 524, 530–531 (2019). On the
court's understanding, while regulations in the first two
categories constitute *per se* takings, those in the third must
be evaluated under *Penn Central*. 923 F. 3d, at 531. The
court agreed with the District Court that the access regula-
tion did not fall into the first category because it did not
"allow random members of the public to unpredictably trav-
erse [the growers'] property 24 hours a day, 365 days a
year." *Id.*, at 532. And given that the growers did not con-
tend that the regulation deprived them of all economically
beneficial use of their property, *per se* treatment was inap-
propriate. *Id.*, at 531, 534.

Judge Leavy dissented. He observed that this Court had
never allowed labor organizers to enter an employer's prop-
erty for substantial periods of time when its employees
lived off premises. *Id.*, at 536; see *Lechmere, Inc.* v. *NLRB*,
502 U. S. 527, 540–541 (1992); *NLRB* v. *Babcock & Wilcox
Co.*, 351 U. S. 105, 113 (1956). As he saw it, the regulation
constituted a physical occupation and therefore effected a
*per se* taking. 923 F. 3d, at 538.

The Ninth Circuit denied rehearing en banc. Judge Ikuta
dissented, joined by seven other judges. She reasoned that
the access regulation appropriated from the growers a tra-
ditional form of private property—an easement in gross—
and transferred that property to union organizers. *Cedar
Point Nursery* v. *Shiroma*, 956 F. 3d 1162, 1168, 1171
(2020). The appropriation of such an easement, she con-
cluded, constituted a *per se* physical taking under the prec-
edents of this Court. *Id.*, at 1168.

We granted certiorari. 592 U. S. ___ (2020).

## II

### A

The Takings Clause of the Fifth Amendment, applicable

to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation."  The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom.  As John Adams tersely put it, "[p]roperty must be secured, or liberty cannot exist." Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851).  This Court agrees, having noted that protection of property rights is "necessary to preserve freedom" and "empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Murr* v. *Wisconsin*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 8).

When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation.  *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 321 (2002). The Court's physical takings jurisprudence is "as old as the Republic." *Id.*, at 322.  The government commits a physical taking when it uses its power of eminent domain to formally condemn property.  See *United States* v. *General Motors Corp.*, 323 U. S. 373, 374–375 (1945); *United States ex rel. TVA* v. *Powelson*, 319 U. S. 266, 270–271 (1943).  The same is true when the government physically takes possession of property without acquiring title to it.  See *United States* v. *Pewee Coal Co.*, 341 U. S. 114, 115–117 (1951) (plurality opinion).  And the government likewise effects a physical taking when it occupies property—say, by recurring flooding as a result of building a dam. See *United States* v. *Cress*, 243 U. S. 316, 327–328 (1917).  These sorts of physical appropriations constitute the "clearest sort of taking," *Palazzolo* v. *Rhode Island*, 533 U. S. 606, 617 (2001), and we assess them using a simple, *per se* rule: The government must pay for what it takes.  See *Tahoe-Sierra*, 535 U. S., at 322.

When the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property, a different standard applies. *Id.*, at 321–322. Our jurisprudence governing such use restrictions has developed more recently. Before the 20th century, the Takings Clause was understood to be limited to physical appropriations of property. See *Horne* v. *Department of Agriculture*, 576 U. S. 351, 360 (2015); *Legal Tender Cases*, 12 Wall. 457, 551 (1871). In *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922), however, the Court established the proposition that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.*, at 415. This framework now applies to use restrictions as varied as zoning ordinances, *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 387–388 (1926), orders barring the mining of gold, *United States* v. *Central Eureka Mining Co.*, 357 U. S. 155, 168 (1958), and regulations prohibiting the sale of eagle feathers, *Andrus* v. *Allard*, 444 U. S. 51, 65–66 (1979). To determine whether a use restriction effects a taking, this Court has generally applied the flexible test developed in *Penn Central*, balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action. 438 U. S., at 124.

Our cases have often described use restrictions that go "too far" as "regulatory takings." See, *e.g.*, *Horne*, 576 U. S., at 360; *Yee* v. *Escondido*, 503 U. S. 519, 527 (1992). But that label can mislead. Government action that physically appropriates property is no less a physical taking because it arises from a regulation. That explains why we held that an administrative reserve requirement compelling raisin growers to physically set aside a percentage of their crop for the government constituted a physical rather than a regulatory taking. *Horne*, 576 U. S., at 361. The essential question is not, as the Ninth Circuit seemed to think, whether

the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree). It is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property. See *Tahoe-Sierra*, 535 U. S., at 321–323. Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred, and *Penn Central* has no place.

B

The access regulation appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking. The regulation grants union organizers a right to physically enter and occupy the growers' land for three hours per day, 120 days per year. Rather than restraining the growers' use of their own property, the regulation appropriates for the enjoyment of third parties the owners' right to exclude.

The right to exclude is "one of the most treasured" rights of property ownership. *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 435 (1982). According to Blackstone, the very idea of property entails "that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." 2 W. Blackstone, Commentaries on the Laws of England 2 (1766). In less exuberant terms, we have stated that the right to exclude is "universally held to be a fundamental element of the property right," and is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna* v. *United States*, 444 U. S. 164, 176, 179–180 (1979); see *Dolan* v. *City of Tigard*, 512 U. S. 374, 384, 393 (1994); *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825, 831 (1987); see also Merrill, Property and the Right to Exclude, 77 Neb. L. Rev. 730 (1998) (calling the

right to exclude the "*sine qua non*" of property).

Given the central importance to property ownership of the right to exclude, it comes as little surprise that the Court has long treated government-authorized physical invasions as takings requiring just compensation. The Court has often described the property interest taken as a servitude or an easement.

For example, in *United States* v. *Causby* we held that the invasion of private property by overflights effected a taking. 328 U. S. 256 (1946). The government frequently flew military aircraft low over the Causby farm, grazing the treetops and terrorizing the poultry. *Id.*, at 259. The Court observed that ownership of the land extended to airspace that low, and that "invasions of it are in the same category as invasions of the surface." *Id.*, at 265. Because the damages suffered by the Causbys "were the product of a direct invasion of [their] domain," we held that "a servitude has been imposed upon the land." *Id.*, at 265–266, 267; see also *Portsmouth Harbor Land & Hotel Co.* v. *United States*, 260 U. S. 327, 330 (1922) (government assertion of a right to fire coastal defense guns across private property would constitute a taking).

We similarly held that the appropriation of an easement effected a taking in *Kaiser Aetna* v. *United States*. A real-estate developer dredged a pond, converted it into a marina, and connected it to a nearby bay and the ocean. 444 U. S., at 167. The government asserted that the developer could not exclude the public from the marina because the pond had become a navigable water. *Id.*, at 168. We held that the right to exclude "falls within [the] category of interests that the Government cannot take without compensation." *Id.*, at 180. After noting that "the imposition of the navigational servitude" would "result in an actual physical invasion of the privately owned marina" by members of the public, we cited *Causby* and *Portsmouth* for the proposition that

"even if the Government physically invades only an easement in property, it must nonetheless pay just compensation." 444 U. S., at 180.

In *Loretto* v. *Teleprompter Manhattan CATV Corp.*, we made clear that a permanent physical occupation constitutes a *per se* taking regardless whether it results in only a trivial economic loss. New York adopted a law requiring landlords to allow cable companies to install equipment on their properties. 458 U. S., at 423. Loretto alleged that the installation of a ½-inch diameter cable and two 1½-cubic-foot boxes on her roof caused a taking. *Id.*, at 424. We agreed, stating that where government action results in a "permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.*, at 434–435.

We reiterated that the appropriation of an easement constitutes a physical taking in *Nollan* v. *California Coastal Commission*. The Nollans sought a permit to build a larger home on their beachfront lot. 483 U. S., at 828. The California Coastal Commission issued the permit subject to the condition that the Nollans grant the public an easement to pass through their property along the beach. *Ibid.* As a starting point to our analysis, we explained that, had the Commission simply required the Nollans to grant the public an easement across their property, "we have no doubt there would have been a taking." *Id.*, at 831; see also *Dolan*, 512 U. S., at 384 (holding that compelled dedication of an easement for public use would constitute a taking).

More recently, in *Horne* v. *Department of Agriculture*, we observed that "people still do not expect their property, real or personal, to be actually occupied or taken away." 576 U. S., at 361. The physical appropriation by the government of the raisins in that case was a *per se* taking, even if a regulatory limit with the same economic impact would not

have been. *Id.*, at 362; see *supra*, at 6. "The Constitution," we explained, "is concerned with means as well as ends." 576 U. S., at 362.

The upshot of this line of precedent is that government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation. As in those cases, the government here has appropriated a right of access to the growers' property, allowing union organizers to traverse it at will for three hours a day, 120 days a year. The regulation appropriates a right to physically invade the growers' property—to literally "take access," as the regulation provides. Cal. Code Regs., tit. 8, §20900(e)(1)(C). It is therefore a *per se* physical taking under our precedents. Accordingly, the growers' complaint states a claim for an uncompensated taking in violation of the Fifth and Fourteenth Amendments.

C

The Ninth Circuit saw matters differently, as do the Board and the dissent. In the decision below, the Ninth Circuit took the view that the access regulation did not qualify as a *per se* taking because, although it grants a right to physically invade the growers' property, it does not allow for permanent and continuous access "24 hours a day, 365 days a year." 923 F. 3d, at 532 (citing *Nollan*, 483 U. S., at 832). The dissent likewise concludes that the regulation cannot amount to a *per se* taking because it allows "access short of 365 days a year." *Post*, at 11 (opinion of BREYER, J.). That position is insupportable as a matter of precedent and common sense. There is no reason the law should analyze an abrogation of the right to exclude in one manner if it extends for 365 days, but in an entirely different manner if it lasts for 364.

To begin with, we have held that a physical appropriation is a taking whether it is permanent or temporary. Our cases establish that "compensation is mandated when a

leasehold is taken and the government occupies property for its own purposes, even though that use is temporary." *Tahoe-Sierra*, 535 U. S., at 322 (citing *General Motors Corp.*, 323 U. S. 373; *United States* v. *Petty Motor Co.*, 327 U. S. 372 (1946)). The duration of an appropriation—just like the size of an appropriation, see *Loretto*, 458 U. S., at 436–437—bears only on the amount of compensation. See *United States* v. *Dow*, 357 U. S. 17, 26 (1958). For example, after finding a taking by physical invasion, the Court in *Causby* remanded the case to the lower court to determine "whether the easement taken was temporary or permanent," in order to fix the compensation due. 328 U. S., at 267–268.

To be sure, *Loretto* emphasized the heightened concerns associated with "[t]he permanence and absolute exclusivity of a physical occupation" in contrast to "temporary limitations on the right to exclude," and stated that "[n]ot every physical *invasion* is a taking." 458 U. S., at 435, n. 12; see also *id.*, at 432–435. The latter point is well taken, as we will explain. But *Nollan* clarified that appropriation of a right to physically invade property may constitute a taking "even though no particular individual is permitted to station himself permanently upon the premises." 483 U. S., at 832.

Next, we have recognized that physical invasions constitute takings even if they are intermittent as opposed to continuous. *Causby* held that overflights of private property effected a taking, even though they occurred on only 4% of takeoffs and 7% of landings at the nearby airport. 328 U. S., at 259. And while *Nollan* happened to involve a legally continuous right of access, we have no doubt that the Court would have reached the same conclusion if the easement demanded by the Commission had lasted for only 364 days per year. After all, the easement was hardly continuous as a practical matter. As Justice Brennan observed in

dissent, given the shifting tides, "public passage for a portion of the year would either be impossible or would not occur on [the Nollans'] property."  483 U. S., at 854.  What matters is not that the easement notionally ran round the clock, but that the government had taken a right to physically invade the Nollans' land.  And when the government physically takes an interest in property, it must pay for the right to do so.  See *Horne*, 576 U. S., at 357–358; *Tahoe-Sierra*, 535 U. S., at 322.  The fact that a right to take access is exercised only from time to time does not make it any less a physical taking.

Even the Board declines to defend the Ninth Circuit's absolutist stance.  It prudently concedes that "a requirement that landowners grant an easement otherwise identical to the one in *Nollan* but limited to daylight hours, might very well qualify as 'a taking without regard to other factors that a court might ordinarily examine.'"  Brief for Respondents 25–26 (quoting *Loretto*, 458 U. S., at 432; citation and some internal quotation marks omitted).  But the access regulation, it contends, nevertheless fails to qualify as a *per se* taking because it "authorizes only limited and intermittent access for a narrow purpose."  Brief for Respondents 26.  That position is little more defensible than the Ninth Circuit's.  The fact that the regulation grants access only to union organizers and only for a limited time does not transform it from a physical taking into a use restriction.  Saying that appropriation of a three hour per day, 120 day per year right to invade the growers' premises "does not constitute a taking of a property interest but rather . . . a mere restriction on its use, is to use words in a manner that deprives them of all their ordinary meaning."  *Nollan*, 483 U. S., at 831 (citation and internal quotation marks omitted).

The Board also takes issue with the growers' premise that the access regulation appropriates an easement.  In the Board's estimation, the regulation does not exact a true

easement in gross under California law because the access right may not be transferred, does not burden any particular parcel of property, and may not be recorded. This, the Board says, reinforces its conclusion that the regulation does not take a constitutionally protected property interest from the growers. The dissent agrees, suggesting that the access right cannot effect a *per se* taking because it does not require the growers to grant the union organizers an easement as defined by state property law. See *post*, at 4, 11.

These arguments misconstrue our physical takings doctrine. As a general matter, it is true that the property rights protected by the Takings Clause are creatures of state law. See *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 164 (1998); *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1030 (1992). But no one disputes that, without the access regulation, the growers would have had the right under California law to exclude union organizers from their property. See *Allred* v. *Harris*, 14 Cal. App. 4th 1386, 1390, 18 Cal. Rptr. 2d 530, 533 (1993). And no one disputes that the access regulation took that right from them. The Board cannot absolve itself of takings liability by appropriating the growers' right to exclude in a form that is a slight mismatch from state easement law. Under the Constitution, property rights "cannot be so easily manipulated." *Horne*, 576 U. S., at 365 (internal quotation marks omitted); see also *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 164 (1980) ("a State, by *ipse dixit*, may not transform private property into public property without compensation").

Our decisions consistently reflect this intuitive approach. We have recognized that the government can commit a physical taking either by appropriating property through a condemnation proceeding or by simply "enter[ing] into physical possession of property without authority of a court order." *Dow*, 357 U. S., at 21; see also *United States* v.

*Clarke*, 445 U. S. 253, 256–257, and n. 3 (1980). In the lat-
ter situation, the government's intrusion does not vest it
with a property interest recognized by state law, such as a
fee simple or a leasehold. See *Dow*, 357 U. S., at 21. Yet
we recognize a physical taking all the same. See *id.*, at 22.
Any other result would allow the government to appropri-
ate private property without just compensation so long as it
avoids formal condemnation. We have never tolerated that
outcome. See *Pewee Coal Co.*, 341 U. S., at 116–117. For
much the same reason, in *Portsmouth*, *Causby*, and *Loretto*
we never paused to consider whether the physical invasions
at issue vested the intruders with formal easements accord-
ing to the nuances of state property law (nor do we see how
they could have). Instead, we followed our traditional rule:
Because the government appropriated a right to invade,
compensation was due. That same test governs here.

The Board and the dissent further contend that our deci-
sion in *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74
(1980), establishes that the access regulation cannot qualify
as a *per se* taking. There the California Supreme Court
held that the State Constitution protected the right to en-
gage in leafleting at the PruneYard, a privately owned
shopping center. *Id.*, at 78. The shopping center argued
that the decision had taken without just compensation its
right to exclude. *Id.*, at 82. Applying the *Penn Central* fac-
tors, we held that no compensable taking had occurred. 447
U. S., at 83; cf. *Heart of Atlanta Motel, Inc.* v. *United States*,
379 U. S. 241, 261 (1964) (rejecting claim that provisions of
the Civil Rights Act of 1964 prohibiting racial discrimina-
tion in public accommodations effected a taking).

The Board and the dissent argue that *PruneYard* shows
that limited rights of access to private property should be
evaluated as regulatory rather than *per se* takings. See
*post*, at 8–9. We disagree. Unlike the growers' properties,
the PruneYard was open to the public, welcoming some
25,000 patrons a day. 447 U. S., at 77–78. Limitations on

how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public. See *Horne*, 576 U. S., at 364 (distinguishing *Prune-Yard* as involving "an already publicly accessible" business); *Nollan*, 483 U. S., at 832, n. 1 (same).

The Board also relies on our decision in *NLRB* v. *Babcock & Wilcox Co.* But that reliance is misplaced. In *Babcock*, the National Labor Relations Board found that several employers had committed unfair labor practices under the National Labor Relations Act by preventing union organizers from distributing literature on company property. 351 U. S., at 109. We held that the statute did not require employers to allow organizers onto their property, at least outside the unusual circumstance where their employees were otherwise "beyond the reach of reasonable union efforts to communicate with them." *Id.*, at 113; see also *Lechmere*, 502 U. S., at 540 (employees residing off company property are presumptively not beyond the reach of the union's message). The Board contends that *Babcock*'s approach of balancing property and organizational rights should guide our analysis here. See *Loretto*, 458 U. S., at 434, n. 11 (discussing *Babcock* principle). But *Babcock* did not involve a takings claim. Whatever specific takings issues may be presented by the highly contingent access right we recognized under the NLRA, California's access regulation effects a *per se* physical taking under our precedents. See *Tahoe-Sierra*, 535 U. S., at 322.

## D

In its thoughtful opinion, the dissent advances a distinctive view of property rights. The dissent encourages readers to consider the issue "through the lens of ordinary English," and contends that, so viewed, the "regulation does not *appropriate* anything." *Post*, at 3, 5. Rather, the access regulation merely "*regulates* . . . the owners' right to exclude,"

so it must be assessed "under *Penn Central*'s fact-intensive
test." *Post*, at 2, 5. "A right to enter my woods only on cer-
tain occasions," the dissent elaborates, "is a taking only if
the regulation allowing it goes 'too far.'" *Post*, at 11. The
dissent contends that our decisions in *Causby*, *Portsmouth*,
and *Kaiser Aetna* applied just such a flexible approach, un-
der which the Court "balanced several factors" to determine
whether the physical invasions at issue effected a taking.
*Post*, at 9–11. According to the dissent, this kind of latitude
toward temporary invasions is a practical necessity for gov-
erning in our complex modern world. See *post*, at 11–12.

With respect, our own understanding of the role of prop-
erty rights in our constitutional order is markedly different.
In "ordinary English" "appropriation" means "*taking* as
one's own," 1 Oxford English Dictionary 587 (2d ed. 1989)
(emphasis added), and the regulation expressly grants to
labor organizers the "right to *take* access," Cal. Code Regs.,
tit. 8, §20900(e)(1)(C) (emphasis added). We cannot agree
that the right to exclude is an empty formality, subject to
modification at the government's pleasure. On the con-
trary, it is a "fundamental element of the property right,"
*Kaiser Aetna*, 444 U. S., at 179–180, that cannot be bal-
anced away. Our cases establish that appropriations of a
right to invade are *per se* physical takings, not use re-
strictions subject to *Penn Central*: "[W]hen [government]
planes use private airspace to approach a government air-
port, [the government] is required to pay for that share no
matter how small." *Tahoe-Sierra*, 535 U. S., at 322 (citing
*Causby*). And while *Kaiser Aetna* may have referred to the
test from *Penn Central*, see 444 U. S., at 174–175, the Court
concluded categorically that the government must pay just
compensation for physical invasions, see *id.*, at 180 (citing
*Causby* and *Portsmouth*). With regard to the complexities
of modern society, we think they only reinforce the im-
portance of safeguarding the basic property rights that help
preserve individual liberty, as the Founders explained. See

*supra*, at 5.

In the end, the dissent's permissive approach to property rights hearkens back to views expressed (in dissent) for decades. See, *e.g.*, *Nollan*, 483 U. S., at 864 (Brennan, J., dissenting) ("[The Court's] reasoning is hardly suited to the complex reality of natural resource protection in the 20th century."); *Loretto*, 458 U. S., at 455 (Blackmun, J., dissenting) ("[T]oday's decision . . . represents an archaic judicial response to a modern social problem."); *Causby*, 328 U. S., at 275 (Black, J., dissenting) ("Today's opinion is, I fear, an opening wedge for an unwarranted judicial interference with the power of Congress to develop solutions for new and vital national problems."). As for today's considered dissent, it concludes with "Better the devil we know . . . ," *post*, at 16, but its objections, to borrow from then-Justice Rehnquist's invocation of Wordsworth, "bear[] the sound of 'Old, unhappy, far-off things, and battles long ago,'" *Kaiser Aetna*, 444 U. S., at 177.

## III

The Board, seconded by the dissent, warns that treating the access regulation as a *per se* physical taking will endanger a host of state and federal government activities involving entry onto private property. See *post*, at 11–14. That fear is unfounded.

*First*, our holding does nothing to efface the distinction between trespass and takings. Isolated physical invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts rather than appropriations of a property right. This basic distinction is firmly grounded in our precedent. See *Portsmouth*, 260 U. S., at 329–330 ("[W]hile a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove [the intent to take property]. Every successive trespass adds to the force of the evidence."); 1 P. Nichols, The Law of Eminent Domain §112, p. 311 (1917) ("[A] mere

occasional trespass would not constitute a taking."). And lower courts have had little trouble applying it. See, *e.g.*, *Hendler* v. *United States*, 952 F. 2d 1364, 1377 (CA Fed. 1991) (identifying a "truckdriver parking on someone's vacant land to eat lunch" as an example of a mere trespass).

The distinction between trespass and takings accounts for our treatment of temporary government-induced flooding in *Arkansas Game and Fish Commission* v. *United States*, 568 U. S. 23 (2012). There we held, "simply and only," that such flooding "gains no automatic exemption from Takings Clause inspection." *Id.*, at 38. Because this type of flooding can present complex questions of causation, we instructed lower courts evaluating takings claims based on temporary flooding to consider a range of factors including the duration of the invasion, the degree to which it was intended or foreseeable, and the character of the land at issue. *Id.*, at 38–39. Applying those factors on remand, the Federal Circuit concluded that the government had effected a taking in the form of a temporary flowage easement. *Arkansas Game and Fish Comm'n* v. *United States*, 736 F. 3d 1364, 1372 (2013). Our approach in *Arkansas Game and Fish Commission* reflects nothing more than an application of the traditional trespass-versus-takings distinction to the unique considerations that accompany temporary flooding.

*Second*, many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights. As we explained in *Lucas* v. *South Carolina Coastal Council*, the government does not take a property interest when it merely asserts a "pre-existing limitation upon the land owner's title." 505 U. S., at 1028–1029. For example, the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because he never had a right to engage in the nuisance in the first place. See *id.*, at 1029–1030.

These background limitations also encompass traditional

common law privileges to access private property. One such privilege allowed individuals to enter property in the event of public or private necessity. See Restatement (Second) of Torts §196 (1964) (entry to avert an imminent public disaster); §197 (entry to avert serious harm to a person, land, or chattels); cf. *Lucas*, 505 U. S., at 1029, n. 16. The common law also recognized a privilege to enter property to effect an arrest or enforce the criminal law under certain circumstances. Restatement (Second) of Torts §§204–205. Because a property owner traditionally had no right to exclude an official engaged in a reasonable search, see, *e.g.*, *Sandford* v. *Nichols*, 13 Mass. 286, 288 (1816), government searches that are consistent with the Fourth Amendment and state law cannot be said to take any property right from landowners. See generally *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 538 (1967).

*Third*, the government may require property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking. In *Nollan*, we held that "a permit condition that serves the same legitimate police-power purpose as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking." 483 U. S., at 836. The inquiry, we later explained, is whether the permit condition bears an "essential nexus" and "rough proportionality" to the impact of the proposed use of the property. *Dolan*, 512 U. S., at 386, 391; see also *Koontz* v. *St. Johns River Water Management Dist.*, 570 U. S. 595, 599 (2013).

Under this framework, government health and safety inspection regimes will generally not constitute takings. See, *e.g.*, *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1007 (1984). When the government conditions the grant of a benefit such as a permit, license, or registration on allowing access for reasonable health and safety inspections, both the nexus and rough proportionality requirements of the

constitutional conditions framework should not be difficult to satisfy. See, *e.g.*, 7 U. S. C. §136g(a)(1)(A) (pesticide inspections); 16 U. S. C. §823b(a) (hydroelectric project investigations); 21 U. S. C. §374(a)(1) (pharmaceutical inspections); 42 U. S. C. §2201(*o*) (nuclear material inspections).

None of these considerations undermine our determination that the access regulation here gives rise to a *per se* physical taking. Unlike a mere trespass, the regulation grants a formal entitlement to physically invade the growers' land. Unlike a law enforcement search, no traditional background principle of property law requires the growers to admit union organizers onto their premises. And unlike standard health and safety inspections, the access regulation is not germane to any benefit provided to agricultural employers or any risk posed to the public. See *Horne*, 576 U. S., at 366 ("basic and familiar uses of property" are not a special benefit that "the Government may hold hostage, to be ransomed by the waiver of constitutional protection"). The access regulation amounts to simple appropriation of private property.

*      *      *

The access regulation grants labor organizations a right to invade the growers' property. It therefore constitutes a *per se* physical taking.

The judgment of the United States Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 20–107

CEDAR POINT NURSERY, ET AL., PETITIONERS *v.*
VICTORIA HASSID, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 23, 2021]

JUSTICE KAVANAUGH, concurring.

I join the Court's opinion, which carefully adheres to constitutional text, history, and precedent. I write separately to explain that, in my view, the Court's precedent in *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S. 105 (1956), also strongly supports today's decision.

In *Babcock*, the National Labor Relations Board argued that the National Labor Relations Act afforded union organizers a right to enter company property to communicate with employees. Several employers responded that the Board's reading of the Act would infringe their Fifth Amendment property rights. The employers contended that Congress, "even if it could constitutionally do so, has at no time shown any intention of destroying property rights secured by the *Fifth Amendment*, in protecting employees' rights of collective bargaining under the Act. Until Congress should evidence such intention by specific legislative language, our courts should not construe the Act on such dangerous constitutional grounds." Brief for Respondent in *NLRB* v. *Babcock & Wilcox Co.*, O. T. 1955, No. 250, pp. 18–19.

This Court agreed with the employers' argument that the Act should be interpreted to avoid unconstitutionality. The Court reasoned that "the National Government" via the Constitution "preserves property rights," including "the

right to exclude from property." *Babcock*, 351 U. S., at 112. Against the backdrop of the Constitution's strong protection of property rights, the Court interpreted the Act to afford access to union organizers only when "needed," *ibid.*—that is, when the employees live on company property and union organizers have no other reasonable means of communicating with the employees, *id.,* at 113. See also *Lechmere, Inc.* v. *NLRB*, 502 U. S. 527, 540–541 (1992). As I read it, *Babcock* recognized that employers have a basic Fifth Amendment right to exclude from their private property, subject to a "necessity" exception similar to that noted by the Court today. *Ante*, at 19.

*Babcock* strongly supports the growers' position in today's case because the California union access regulation intrudes on the growers' property rights far more than *Babcock* allows. When this same California union access regulation was challenged on constitutional grounds before the California Supreme Court in 1976, that court upheld the regulation by a 4-to-3 vote. *Agricultural Labor Rel. Bd.* v. *Superior Ct. of Tulare Cty.*, 16 Cal. 3d 392, 546 P. 2d 687. Justice William Clark wrote the dissent. Justice Clark stressed that "property rights are fundamental." *Id.*, at 429, n. 4, 546 P. 2d, at 712, n. 4. And he concluded that the California union access regulation "violates the rule" of *Babcock* and thus "violates the constitutional provisions protecting private property." 16 Cal. 3d, at 431, 546 P. 2d, at 713. In my view, Justice Clark had it exactly right.

With those comments, I join the Court's opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–107

_____

## CEDAR POINT NURSERY, ET AL., PETITIONERS *v.* VICTORIA HASSID, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 23, 2021]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

A California regulation provides that representatives of a labor organization may enter an agricultural employer's property for purposes of union organizing. They may do so during four months of the year, one hour before the start of work, one hour during an employee lunch break, and one hour after work. The question before us is how to characterize this regulation for purposes of the Constitution's Takings Clause.

Does the regulation *physically appropriate* the employers' property? If so, there is no need to look further; the Government must pay the employers "just compensation." U. S. Const., Amdt. 5; see *Arkansas Game and Fish Comm'n* v. *United States*, 568 U. S. 23, 31 (2012) ("'[W]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner'"). Or does the regulation simply *regulate* the employers' property rights? If so, then there is every need to look further; the government need pay the employers "just compensation" only if the regulation "goes too far." *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922) (Holmes, J., for the Court); see also *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 124 (1978) (determining whether a regulation is a taking by

examining the regulation's "economic impact," the extent of interference with "investment-backed expectations," and the "character of the governmental action"); *Arkansas Game and Fish Comm'n*, 568 U. S., at 38–39 (listing factors relevant to the character of the regulation).

The Court holds that the provision's "access to organizers" requirement amounts to a physical appropriation of property. In its view, virtually every government-authorized invasion is an "appropriation." But this regulation does not "appropriate" anything; it regulates the employers' right to exclude others. At the same time, our prior cases make clear that the regulation before us allows only a *temporary* invasion of a landowner's property and that this kind of temporary invasion amounts to a taking only if it goes "too far." See, *e.g., Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 434 (1982). In my view, the majority's conclusion threatens to make many ordinary forms of regulation unusually complex or impractical. And though the majority attempts to create exceptions to narrow its rule, see *ante*, at 17–20, the law's need for feasibility suggests that the majority's framework is wrong. With respect, I dissent from the majority's conclusion that the regulation is a *per se* taking.

I

"In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in this area." *Arkansas Game and Fish Comm'n*, 568 U. S., at 31; see also *Kaiser Aetna* v. *United States*, 444 U. S. 164, 175 (1979) ("[T]his Court has generally 'been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government'"). Instead, most government action affecting property rights is analyzed case by case under *Penn Central*'s fact-intensive test. Petitioners

do not argue that the provision at issue is a "regulatory taking" under that test.

Instead, the question before us is whether the access regulation falls within one of two narrow categories of government conduct that are *per se* takings. The first is when "'the government directly appropriates private property for its own use.'" *Horne* v. *Department of Agriculture*, 576 U. S. 351, 357 (2015). The second is when the government causes a permanent physical occupation of private property. See *Lingle* v. *Chevron U. S. A. Inc.*, 544 U. S. 528, 538 (2005). It does not.

### A

Initially it may help to look at the legal problem—a problem of characterization—through the lens of ordinary English. The word "regulation" rather than "appropriation" fits this provision in both label and substance. Cf. *ante*, at 6. It is contained in Title 8 of the California Code of Regulations. It was adopted by a state regulatory board, namely, the California Agricultural Labor Relations Board, in 1975. It is embedded in a set of related detailed regulations that describe and limit the access at issue. In addition to the hours of access just mentioned, it provides that union representatives can enter the property only "for the purpose of meeting and talking with employees and soliciting their support"; they have access only to "areas in which employees congregate before and after working" or "at such location or locations as the employees eat their lunch"; and they cannot engage in "conduct disruptive of the employer's property or agricultural operations, including injury to crops or machinery or interference with the process of boarding buses." §§20900(e), (e)(3), (e)(4)(C) (2021). From the employers' perspective, it restricts when and where they can exclude others from their property.

At the same time, the provision only awkwardly fits the terms "physical taking" and "physical appropriation." The

"access" that it grants union organizers does not amount to
any traditional property interest in land.  It does not, for
example, take from the employers, or provide to the organ-
izers, any freehold estate (*e.g.*, a fee simple, fee tail, or life
estate); any concurrent estate (*e.g.*, a joint tenancy, tenancy
in common, or tenancy by the entirety); or any leasehold es-
tate (*e.g.*, a term of years, periodic tenancy, or tenancy at
will).  See J. Dukeminier, J. Krier, G. Alexander, M. Schill,
& L. Strahilevitz, Property 215–216, 222–224, 226, 343–
345, 443–445 (8th ed. 2014).  Nor (as all now agree) does it
provide the organizers with a formal easement or access re-
sembling an easement, as the employers once argued, since
it does not burden any particular parcel of property.  See,
*e.g., Balestra* v. *Button*, 54 Cal. App. 2d 192, 197 (1942) (the
burden of an easement in gross is appurtenant to "the real
property of another"); Restatement (Third) of Property: Ser-
vitudes §1.2(3) (1998) ("The burden of an easement or profit
is always appurtenant"); see also *ante*, at 13 (acknowledg-
ing a "slight mismatch from state easement law").  Compare
Pet. for Cert. i (asking the Court to address "whether the
uncompensated appropriation of an easement that is lim-
ited in time effects a *per se* physical taking under the Fifth
Amendment"), with Reply Brief 8 ("[T]he access required
here does not bear *all* the hallmarks of an easement").

  The majority concludes that the regulation nonetheless
amounts to a physical taking of property because, the ma-
jority says, it "appropriates" a "right to invade" or a "right
to exclude" others.  See *ante*, at 7, 12, 14, 15, 16, 20 (right
to invade); *ante*, at 7, 8, 10, 13, 16 (right to exclude).  It
thereby likens this case to cases in which we have held that
appropriation of property rights amounts to a physical
*per se* taking.  See *ante,* at 5–6 (citing *United States* v. *Pe-
wee Coal Co.*, 341 U. S. 114, 115 (1951) (plurality opinion)
(seizure and operation of a coal mine by the United States);
*United States* v. *General Motors Corp.*, 323 U. S. 373, 375
(1945) (condemnation of a warehouse building by the

United States); *Horne*, 576 U. S., at 361 (transfer of "[a]ctual raisins," and title to the raisins, from growers to the Government)).

It is important to understand, however, that, technically speaking, the majority is wrong. The regulation does not *appropriate* anything. It does not take from the owners a right to invade (whatever that might mean). It does not give the union organizations the right to exclude anyone. It does not give the government the right to exclude anyone. What does it do? It gives union organizers the right temporarily to invade a portion of the property owners' land. It thereby limits the landowners' right to exclude certain others. The regulation *regulates* (but does not *appropriate*) the owners' right to exclude.

Why is it important to understand this technical point? Because only then can we understand the issue before us. That issue is whether a regulation that *temporarily* limits an owner's right to exclude others from property *automatically* amounts to a Fifth Amendment taking. Under our cases, it does not.

B

Our cases draw a distinction between regulations that provide permanent rights of access and regulations that provide nonpermanent rights of access. They either state or hold that the first type of regulation is a taking *per se,* but the second kind is a taking only if it goes "too far." And they make this distinction for good reason.

Consider the Court's reasoning in an important case in which the Court found a *per se* taking. In *Loretto*, the Court considered the status of a New York law that required landlords to permit cable television companies to install cable facilities on their property. 458 U. S., at 421. We held that the installation amounted to a permanent physical occupation of the property and hence to a *per se* taking. See *id.,* at 441 ("affirm[ing] the traditional rule that a permanent

physical occupation of property is a taking"); see also *id.*, at 427 (tracing that rule back to 1872). In reaching this holding we specifically said that "[n]ot every physical invasion is a taking." *Id.*, at 435, n. 12 (emphasis deleted); see also *ante*, at 11 (acknowledging that this "point is well taken"). We explained that the "permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude." *Loretto*, 458 U. S., at 435, n. 12. And we provided an example of a federal statute that did *not* effect a *per se* taking—an example almost identical to the regulation before us. That statute provided "'access . . . limited to (i) union organizers; (ii) prescribed non-working areas of the employer's premises; and (iii) the duration of the organization activity.'" *Id.*, at 434, n. 11 (quoting *Central Hardware Co.* v. *NLRB*, 407 U. S. 539, 545 (1972)).

We also explained why permanent physical occupations are distinct from temporary limitations on the right to exclude. We said that, when the government permanently occupies property, it "does not simply take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand," "effectively destroy[ing]" "the rights 'to possess, use and dispose of it.'" *Loretto*, 458 U. S., at 435. We added that the property owner "ha[d] no right to possess the occupied space himself, and also ha[d] no power to exclude the occupier from possession and use of the space." *Ibid.* The requirement "forever denie[d] the owner any power to control the use of the property" or make any "nonpossessory use" of it. *Id.,* at 436. It would "ordinarily empty the right" to sell or transfer the occupied space "of any value, since the purchaser w[ould] also be unable to make any use of the property." *Ibid.* The owner could not "exercise control" over the equipment's installation, and so could not "minimize [its] physical, esthetic, and other effects." *Id.*, at 441, n. 19. Thus, we concluded, a permanent physical occupation "is perhaps the

most serious form of invasion of an owner's property inter-
ests." *Id.*, at 435.

Now consider *PruneYard Shopping Center* v. *Robins*, 447
U. S. 74 (1980). We there considered the status of a state
constitutional requirement that a privately owned shop-
ping center permit other individuals to enter upon, and to
use, the property to exercise their rights to free speech and
petition. See *id.,* at 78. We held that this requirement was
not a *per se* taking in part because (even though the indi-
viduals may have "'physically invaded'" the owner's prop-
erty) "[t]here [wa]s nothing to suggest that preventing [the
owner] from prohibiting this sort of activity w[ould] unrea-
sonably impair the value or use of th[e] property as a shop-
ping center," and the owner could "adop[t] time, place, and
manner regulations that w[ould] minimize any interference
with its commercial functions." *Id.*, at 83–84; see also
*Loretto*, 458 U. S., at 434 (describing the "invasion" in
*PruneYard* as "temporary and limited in nature").

In *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825
(1987), we held that the State's taking of an easement
across a landowner's property did constitute a *per se* taking.
But consider the Court's reason: "[I]ndividuals are given a
*permanent and continuous* right to pass to and fro." *Id.,* at
832 (emphasis added). We clarified that by "permanent"
and "continuous" we meant that the "real property may con-
tinuously be traversed, even though no particular individ-
ual is permitted to station himself permanently upon the
premises." *Ibid.*

In *Arkansas Game and Fish Comm'n*, 568 U. S. 23, we
again said that permanent physical occupations are *per se*
takings, but temporary invasions are not. Rather, they
"'are subject to a more complex balancing process to deter-
mine whether they are a taking.'" *Id.,* at 36; see also *id.,* at
38–39 (courts should consider the length of the invasion,
the "degree to which the invasion is intended or is the fore-

seeable result of authorized government action," "the character of the land at issue," "the owner's 'reasonable investment-backed expectations' regarding the land's use," and the "[s]everity of the interference" (citing, *inter alia*, *Penn Central*, 438 U. S., at 130–131)).

As these cases have used the terms, the regulation here at issue provides access that is "temporary," not "permanent." Unlike the regulation in *Loretto*, it does not place a "fixed structure on land or real property." 458 U. S., at 437. The employers are not "forever denie[d]" "any power to control the use" of any particular portion of their property. *Id.*, at 436. And it does not totally reduce the value of any section of the property. *Ibid.* Unlike in *Nollan*, the public cannot walk over the land whenever it wishes; rather a subset of the public may enter a portion of the land three hours per day for four months per year (about 4% of the time). At bottom, the regulation here, unlike the regulations in *Loretto* and *Nollan*, is not "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U. S., at 539.

At the same time, *PruneYard*'s holding that the taking was "temporary" (and hence not a *per se* taking) fits this case almost perfectly. There the regulation gave nonowners the right to enter privately owned property for the purpose of speaking generally to others, about matters of their choice, subject to reasonable time, place, and manner restrictions. 447 U. S., at 83. The regulation before us grants a far smaller group of people the right to enter landowners' property for far more limited times in order to speak about a specific subject. Employers have more power to control entry by setting work hours, lunch hours, and places of gathering. On the other hand, as the majority notes, the shopping center in *PruneYard* was open to the public generally. See *ante*, at 14–15. All these factors, how-

ever, are the stuff of which regulatory-balancing, not absolute *per se*, rules are made.

Our cases have recognized, as the majority says, that the right to exclude is a "'fundamental element of the property right.'" *Ante*, at 16. For that reason, "[a] 'taking' may *more readily* be found when the interference with property can be characterized as a physical invasion by government." *Penn Central*, 438 U. S., at 124 (emphasis added); see also *Loretto*, 458 U. S., at 426 ("[W]e have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause"). But a taking is not inevitably found just because the interference with property can be characterized as a physical invasion by the government, or, in other words, when it affects the right to exclude.

The majority refers to other cases. But those cases do not help its cause. That is because the Court in those cases (some of which preceded *Penn Central* and others of which I have discussed above) did not apply a "*per se* takings" approach. But see *ante*, at 14 (claiming that our "traditional rule" is that when "the government appropriate[s] a right to invade, compensation [i]s due"). In *United States* v. *Causby*, 328 U. S. 256, 259 (1946), for example, the question was whether government flights over a piece of land constituted a taking. The flights amounted to 4% of the takeoffs, and 7% of the landings, at a nearby airport. See *ibid.* But the planes flew "in considerable numbers and rather close together." *Ibid.* And the flights were "so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." *Id.*, at 266. Taken together, those flights "destr[oyed] the use of the property as a commercial chicken farm." *Id.*, at 259. Based in part on that economic damage, the Court found that the rule allowing these overflights went "too far." See *id.,* at 266 (" '[I]t is the character of the invasion, not the amount of damage resulting from it, *so long as the damage is substantial*, that

determines the question whether it is a taking' " (emphasis added)).

In *Portsmouth Harbor Land & Hotel Co.* v. *United States*, 260 U. S. 327, 329 (1922), the Court held that the Government's firing of guns across private property would be a taking only if the shots were sufficiently frequent to establish an "intent to fire across the claimants' land at will." The frequency of the projectiles itself mattered less than whether the Government acted "'with the purpose and effect of subordinating the strip of land . . . to the right and privilege of the Government to fire projectiles directly across it for the purpose of practice or otherwise, *whenever it saw fit*, in time of peace, with the result of depriving the owner of its profitable use.'" *Ibid.* (emphasis added). Again, the Court balanced several factors—permanence, severity, and economic impact—rather than treating the mere fact of entry as dispositive.

In *Kaiser Aetna* v. *United States*, 444 U. S. 164, the Court considered whether the Government had taken property by converting a formerly "private pond" (with a private access fee) into a "public aquatic park" (with free navigation-related access for the public). *Id.*, at 176, 180. The Court held there was a taking. But in doing so, it applied a *Penn Central,* not a *per se,* analysis. The Court wrote that "[m]ore than one factor contribute[d] to" the conclusion that the Government had gone "far beyond ordinary regulation or improvement." 444 U. S., at 178. And it found there was a taking.

If there is ambiguity in these cases, it concerns whether the Court considered the occupation at issue to be *temporary* (requiring *Penn Central*'s "too far" analysis) or *permanent* (automatically requiring compensation). Nothing in them suggests the majority's view, namely, that compensation is automatically required for a *temporary* right of access. Nor does anything in them support the distinction that the majority gleans between "trespass" and "takings."

See *ante*, at 17–18; see also *infra*, at 14.

The majority also refers to *Nollan* as support for its claim that the "fact that a right to take access is exercised only from time to time does not make it any less a physical taking." *Ante*, at 12. True. Here, however, unlike in *Nollan,* the right taken is not a right to have access to the property at any time (which access different persons "exercis[e] . . . from time to time"). Rather here we have a right that does not allow access at any time. It allows access only from "time to time." And that makes all the difference. A right to enter my woods whenever you wish is a right to use that property permanently, even if you exercise that right only on occasion. A right to enter my woods only on certain occasions is not a right to use the woods permanently. In the first case one might reasonably use the term *per se* taking. It is as if my woods are yours. In the second case it is a taking only if the regulation allowing it goes "too far," considering the factors we have laid out in *Penn Central*. That is what our cases say.

Finally, the majority says that *Nollan* would have come out the same way had it involved, similar to the regulation here, access short of 365 days a year. See *ante*, at 11. Perhaps so. But, if so, that likely would be because the Court would have viewed the access as an "easement," and therefore an appropriation. See *Nollan*, 483 U. S., at 828. Or, perhaps, the Court would have viewed the regulation as going "too far." I can assume, purely for argument's sake, that that is so. But the law is clear: A regulation that provides *temporary*, not *permanent*, access to a landowner's property, and that does not amount to a taking of a traditional property interest, is not a *per se* taking. That is, it does not automatically require compensation. Rather, a court must consider whether it goes "too far."

## C

The persistence of the permanent/temporary distinction

that I have described is not surprising. That distinction serves an important purpose. We live together in communities. (Approximately 80% of Americans live in urban areas. U. S. Census Bureau, Urban Area Facts (Mar. 30, 2021), https://www.census.gov/programs-surveys/ geography/guidance/geo-areas/urban-rural/ua-facts.html.) Modern life in these communities requires different kinds of regulation. Some, perhaps many, forms of regulation require access to private property (for government officials or others) for different reasons and for varying periods of time. Most such temporary-entry regulations do not go "too far." And it is impractical to compensate every property owner for any brief use of their land. As we have frequently said, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co.*, 260 U. S., at 413; see also, *e.g.*, *Murr* v. *Wisconsin*, 582 U. S. ___, ___–___ (2017) (slip op., at 8–9) (same); *Lingle*, 544 U. S., at 538 (same); *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 335 (2002) (same); *Dolan* v. *City of Tigard*, 512 U. S. 374, 384–385 (1994) (same); *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1018 (1992) (same); *Andrus* v. *Allard*, 444 U. S. 51, 65 (1979) (same); *Penn Central*, 438 U. S, at 124 (same). Thus, the law has not, and should not, convert all temporary-access-permitting regulations into *per se* takings automatically requiring compensation. See, *e.g.*, *Hodel* v. *Irving*, 481 U. S. 704, 713 (1987) ("This Court has held that the Government has considerable latitude in regulating property rights in ways that may adversely affect the owners").

Consider the large numbers of ordinary regulations in a host of different fields that, for a variety of purposes, permit temporary entry onto (or an "invasion of") a property owner's land. They include activities ranging from examination of food products to inspections for compliance with

preschool licensing requirements. See, *e.g.*, 29 U. S. C. §657(a) (authorizing inspections and investigations of "any . . . workplace or environment where work is performed" during "regular working hours and at other reasonable times"); 21 U. S. C. §606(a) (authorizing "examination and inspection of all meat food products . . . at all times, by day or night"); 42 U. S. C. §5413(b) (authorizing inspections anywhere "manufactured homes are manufactured, stored, or held for sale" at "reasonable times and without advance notice"); Miss. Code Ann. §49–27–63 (2012) (authorizing inspections of "coastal wetlands" "from time to time"); Mich. Comp. Laws §208.1435(5) (2010) (authorizing inspections of any "historic resource" "at any time during the rehabilitation process"); Mont. Code Ann. §81–22–304 (2019) (granting a "right of entry . . . [into] any premises where dairy products . . . are produced, manufactured, [or] sold" "during normal business hours"); Neb. Rev. Stat. §43–1303(5) (2016) (authorizing visitation of "foster care facilities in order to ascertain whether the individual physical, psychological, and sociological needs of each foster child are being met"); Va. Code Ann. §22.1–289.032(C)(8) (Cum. Supp. 2020) (authorizing "annual inspection" of "preschool programs of accredited private schools"); Cincinnati, Ohio, Municipal Code §603–1 (2021) (authorizing entry "at any time" for any place in which "animals are slaughtered"); Dallas, Tex., Code of Ordinance §33–5(a) (2021) (authorizing inspection of "assisted living facilit[ies]" "at reasonable times"); 6 N. Y. Rules & Regs. §360.7 (Supp. 2020) (authorizing inspection of solid waste management facilities "at all reasonable times, locations, whether announced or unannounced"); see also *Boise Cascade Corp.* v. *United States*, 296 F. 3d 1339, 1352 (CA Fed. 2002) (affirming an injunction requiring property owner to allow Government agents to enter its property to conduct owl surveys); Brief for Respondents 43–44, 46 (collecting similar regulations); App. to Brief for Local Governments as *Amici Curiae* 1–13

(same); Brief for Virginia et al. as *Amici Curiae* 3–6 (same).

The majority tries to deal with the adverse impact of treating these, and other, temporary invasions as if they were *per se* physical takings by creating a series of exceptions from its *per se* rule. It says: (1) "Isolated physical invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts rather than appropriations of a property right." *Ante*, at 17. It also would except from its *per se* rule (2) government access that is "consistent with longstanding background restrictions on property rights," including "traditional common law privileges to access private property." *Ante,* at 18–19. And it adds that (3) "the government may require property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking." *Ante*, at 19. How well will this new system work? I suspect that the majority has substituted a new, complex legal scheme for a comparatively simpler old one.

As to the first exception, what will count as "isolated"? How is an "isolated physical invasion" different from a "temporary" invasion, sufficient under present law to invoke *Penn Central*? And where should one draw the line between trespass and takings? Imagine a school bus that stops to allow public school children to picnic on private land. Do three stops a year place the stops outside the exception? One stop every week? Buses from one school? From every school? Under current law a court would know what question to ask. The stops are temporary; no one assumes a permanent right to stop; thus the court will ask whether the school district has gone "too far." Under the majority's approach, the court must answer a new question (apparently about what counts as "isolated").

As to the second exception, a court must focus on "traditional common law privileges to access private property." Just what are they? We have said before that the govern-

ment can, without paying compensation, impose a limitation on land that "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas*, 505 U. S., at 1029. But we defined a very narrow set of such background principles. See *ibid.*, and n. 16 (abatement of nuisances and cases of "'actual necessity'" or "to forestall other grave threats to the lives and property of others"). To these the majority adds "public or private necessity," the enforcement of criminal law "under certain circumstances," and reasonable searches. *Ante*, at 19. Do only those exceptions that existed in, say, 1789 count? Should courts apply those privileges as they existed at that time, when there were no union organizers? Or do we bring some exceptions (but not others) up to date, *e.g.*, a necessity exception for preserving animal habitats?

As to the third, what is the scope of the phrase "certain benefits"? Does it include the benefit of being able to sell meat labeled "inspected" in interstate commerce? But see *Horne*, 576 U. S., at 366 (concluding that "[s]elling produce in interstate commerce" is "not a special governmental benefit"). What about the benefit of having electricity? Of sewage collection? Of internet accessibility? Myriad regulatory schemes based on just these sorts of benefits depend upon intermittent, temporary government entry onto private property.

Labor peace (brought about through union organizing) is one such benefit, at least in the view of elected representatives. They wrote laws that led to rules governing the organizing of agricultural workers. Many of them may well have believed that union organizing brings with it "benefits," including community health and educational benefits, higher standards of living, and (as I just said) labor peace. See, *e.g.,* 1975 Cal. Stats. ch. 1, §1 (stating that the purpose of the Agricultural Labor Relations Act was to "ensure peace in the agricultural fields by guaranteeing justice for

all agricultural workers and stability in labor relations"). A landowner, of course, may deny the existence of these benefits, but a landowner might do the same were a regulatory statute to permit brief access to verify proper preservation of wetlands or the habitat enjoyed by an endangered species or, for that matter, the safety of inspected meat. So, if a regulation authorizing temporary access for purposes of organizing agricultural workers falls outside of the Court's exceptions and is a *per se* taking*,* then to what other forms of regulation does the Court's *per se* conclusion also apply?

## II

Finally, I touch briefly on remedies, which the majority does not address. The Takings Clause prohibits the Government from taking private property for public use without "just compensation." U. S. Const., Amdt. 5. But the employers do not seek compensation. They seek only injunctive and declaratory relief. Indeed, they did not allege any damages. See App. to Pet. for Cert. G–16 to G–17. On remand, California should have the choice of foreclosing injunctive relief by providing compensation. See, *e.g.*, *Knick* v. *Township of Scott*, 588 U. S. __, __ (2019) (slip op., at 23) ("As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed").

\* \* \*

I recognize that the Court's prior cases in this area are not easy to apply. Moreover, words such as "temporary," "permanent," or "too far" do not define themselves. But I do not believe that the Court has made matters clearer or better. Rather than adopt a new broad rule and indeterminate exceptions, I would stick with the approach that I believe the Court's case law sets forth. "Better the devil we know . . . ." A right of access such as the right at issue here, a nonpermanent right, is not automatically a "taking." It is

a regulation that falls within the scope of *Penn Central*. Because the Court takes a different view, I respectfully dissent.