#30317, #30338-r-JMK
**2024 S.D. 48**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

#30317

BETTY JEAN STROM TRUST, RITA
BROWN, and CRAIG AND LISA BASLER
FAMILY TRUST,                                    Plaintiffs and Appellants,

v.

SCS CARBON TRANSPORT, LLC, a
Delaware Limited Liability Company,
a/k/a SUMMIT CARBON SOLUTIONS,          Defendant and Appellee,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PATRICIA K. DEEG TRUST,                          Plaintiff and Appellant,

v.

SCS CARBON TRANSPORT, LLC, a
Delaware Limited Liability Company,
a/k/a SUMMIT CARBON SOLUTIONS,          Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY AND
LAKE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICK T. PARDY
Judge

* * * *

ARGUED
MARCH 19, 2024
OPINION FILED **08/21/24**

* * * *

#30338

PETER HELFENSTEIN, JR., ROTT
FARMS, INC., KETTERLING FARM,
LLC, VILHAUER LAND LIMITED
PARTNERSHIP, BRIAN HOFFMAN, THE
DAVID AND VALERIE RATH LIVING
TRUST, COLIN AND MARY BETH
HOFFMAN, JEROME G. HOFFMAN,
MICHAEL AND NANCY KLIPFEL,
ALDEN AND WILMA FLAKOLL,
SHANTEL C. SCHUMACK, LEROY AND
JOAN WEISZHAAR, and WADE AND
JUDY WEISZHAAR,                          Plaintiffs and Appellants,

        v.

SCS CARBON TRANSPORT, LLC,
a/k/a SUMMIT CARBON SOLUTIONS,          Defendant and Appellee,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SCS CARBON TRANSPORT, LLC,               Plaintiff and Appellee,

        v.

GERALDINE H. SAYLER JORDRE,
DENNIS WOLFF, QUINTON WOLFF,
R&C FEICKERT LAND LLC, REBECCA D.
MICHAELSOHN, DAVID MELLAND, ROTT
RANCH LIMITED PARTNERSHIP, THE
ROGER E. MEYER AND ELIZABETH I.
MEYER REVOCABLE LIVING TRUST,
SUSIE K. TREFTZ, PAMELA KESSLER,
GARY AND SHIRLEY WOLFF LIVING
TRUST, WILLARD GOESHEL, LARVINA W.
MEIER, KEN STUGELMAYER, MARSHA M
VOSSLER, THE MARK M. VOSSLER AND
MARSHA M. VOSSLER REVOCABLE TRUST,
MARILYN D. NELSON, MARK THOMPSON,
THE ESTATE OF ALBERT EUGENE ERDMANN,
CHARLES E. SCHAUNAMAN, JEROME R. WAHL,
THE VIRGINIA L. BREITAG LIVING TRUST, and
SIEH FARMS, LLC,                         Defendants and Appellants,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BRAUN FAMILY TRUST 2020, B&L
FISCHBACH FARMS, MARGARET
ELLETT LIVING TRUST, KEN OLSON
TRUST 2010, OLSON FAMILY TRUST
2019, FRANCOLI FAMILY LIMITED
PARTNERSHIP, FISCHBACH REAL
ESTATE LP, ED AND JOELL FISCHBACH,
ARMADALE LIMITED PARTNERSHIP,
PAUL FISCHBACH TRUST 2012 AND DAWN
FISCHBACH TRUST 2012, J&S
PARTNERSHIP, MYRON O. HAMMER
CREDIT SHELTER TESTAMENTARY TRUST,
and JAMES AND ALTA SMITH,                    Plaintiffs and Appellants,

     v.

SCS CARBON TRANSPORT, LLC, a
Delaware Limited Liability Company,
a/k/a SUMMIT CARBON SOLUTIONS,               Defendant and Appellee

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JARED BOSSLY, BOSSLY REAL
ESTATE LIMITED PARTNERSHIP,
KENNETH AND DIANNA SHAFER,
ESTATE OF DONALD A. SCHAUNAMAN,
KIRK SCHAUNAMAN, JOYCE DAHME,
TODD AND DONNA ROZELL, SCOTT
ROZELL, DENNIS AND JEAN HASELHORST,
MILTON AND RHONDA HASELHORST, SETH
KLIPFEL, and MICHAEL AND NANCY
KLIPFEL,                                     Plaintiffs and Appellants,

     v.

SCS CARBON TRANSPORT, LLC, a
Delaware Limited Liability Company,
a/k/a SUMMIT CARBON SOLUTIONS,               Defendant and Appellee,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DELORES SCHUMACHER REVOCABLE
TRUST, and JOHN AND STEPHANIE
JUNG,                                        Plaintiffs and Appellants,

     v.

SCS CARBON TRANSPORT, LLC,
a/k/a SUMMIT CARBON SOLUTIONS,               Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
MCPHERSON COUNTY, SPINK COUNTY
BROWN COUNTY, AND EDMUNDS
COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RICHARD A. SOMMERS
Judge

* * * *

BRIAN E. JORDE of
Domina Law Group
Omaha, Nebraska

NICHOLAS G. MOSER of
Marlow, Woodward & Huff
Yankton, South Dakota

CHRIS HEALY
Vermillion, South Dakota                Attorneys for appellants.


BRET A. DUBLINSKE of
Fredrikson & Byron, P.A.
Des Moines, Iowa

BRETT KOENECKE
JUSTIN L. BELL
CASH E. ANDERSON
CODY L. HONEYWELL of
May Adam Gerdes & Thompson
Pierre, South Dakota

BRIAN D. BOONE
MICHAEL R. HOERNLEIN
MATTHEW P. HOOKER of
Alson & Bird LLP
Charlotte, North Carolina                Attorneys for appellees.

KERN, Justice

[¶1.]        SCS Carbon Transport, LLC (SCS) is planning to develop a pipeline network to transport carbon dioxide ($CO_2$) through South Dakota.  Several landowners (Landowners) along the proposed route refused to allow SCS pre-condemnation survey access, which SCS claims is authorized by SDCL 21-35-31. Landowners sued in both the Third and Fifth Judicial Circuits, seeking declaratory and injunctive relief to prevent the surveys.  These proceedings resulted in a consolidated appeal from six lawsuits filed by Landowners and one by SCS.  Two cases were filed in the Third Circuit: CIV 22-64 (*Strom*) and CIV 22-129 (*Deeg*). Five cases were filed in the Fifth Circuit namely: CIV 22-14 (*Helfenstein*), CIV 22-47 (*Braun*), CIV 22-253 (*Bossly*), CIV 22-20 (*Schumacher*), and CIV 22-18 (*Jordre*).

[¶2.]        All cases except for *Jordre*—where SCS was the plaintiff and sought declaratory relief permitting survey access—involved similar claims challenging the constitutionality of SDCL 21-35-31 under the takings and due process clauses of the state and federal constitutions.  Landowners also challenged SCS's status as a common carrier and, by extension, its right to exercise eminent domain power. After limited discovery, SCS moved for and was granted summary judgment on all issues in the cases filed in both circuits.  Landowners appeal.

[¶3.]        We reverse the circuit courts' grants of summary judgment on the common carrier issues.  SCS's ability to conduct pre-condemnation surveys depends on whether it is a common carrier vested with the power of eminent domain. However, in this early phase of the litigation, the record does not demonstrate that SCS is holding itself out to the general public as transporting a commodity for hire.

It is thus premature to conclude that SCS is a common carrier, especially where the record before us suggests that $CO_2$ is being shipped and sequestered underground with no apparent productive use. In addition, the circuit courts abused their discretion in denying Landowners' request for further discovery. The record demonstrates that SCS resisted Landowners' efforts to obtain depositions and documents that are of fundamental importance to the issues in this case. Within the scope of SDCL 15-6-26, Landowners are entitled to conduct depositions and have access to documents relevant to SCS's pricing terms and business model under conditions prescribed by the courts to preserve the confidentiality of the information.

[¶4.] On remand, in the event SCS is determined to be a common carrier, we also analyze the scope and constitutionality of SDCL 21-35-31. Mindful of our mandate to interpret the statute according to its plain meaning, and to do so in a fashion that preserves its constitutionality where possible, we conclude that the circuit courts partially erred in their analyses of the types of surveys authorized by SDCL 21-35-31. We hold that—absent landowner consent—the statute, to be interpreted as constitutionally valid, authorizes only minimally invasive superficial inspections that, at most, cause minor soil disturbances. In addition, we interpret SDCL 21-35-31 as incorporating our state constitutional guarantee of a jury determination of damages that are caused by pre-condemnation surveys. Based on this interpretation, we conclude that the limited pre-condemnation surveys authorized by SDCL 21-35-31, as strictly interpreted herein, do not violate the federal or state constitutions.

[¶5.]     We reverse and remand for further proceedings consistent with this opinion.

**Factual and Procedural Background**

[¶6.]     SCS is in the process of developing an underground pipeline network to transport $CO_2$.  The network will include more than 2,000 miles of pipeline in five states: South Dakota, North Dakota, Iowa, Minnesota, and Nebraska.  In South Dakota, the pipeline will travel through eighteen counties: Beadle, Brown, Clark, Codington, Edmunds, Hamlin, Hand, Hyde, Kingsbury, Lake, Lincoln, McCook, McPherson, Miner, Minnehaha, Spink, Sully, and Turner.  Once completed, the pipeline will be able to transport up to 12 million metric tons per annum of captured $CO_2$ to an underground storage location in North Dakota.  The $CO_2$ will then be sequestered underground indefinitely.  To date, more than 34 third-party facilities, including ethanol plants, have signed contracts or letters of intent with SCS for the transportation of $CO_2$.[1]  The pipeline project is anticipated to disturb approximately 6,550 acres within South Dakota, comprising mostly agricultural properties used for crop production or pastureland.

[¶7.]     On February 7, 2022, SCS submitted a siting permit application to the South Dakota Public Utilities Commission (PUC).  This application was denied without prejudice on September 13, 2023, because the proposed pipeline route

---

1.     Some of the contracts involve lengthy offtake agreements, whereby SCS agrees to transport a certain amount of $CO_2$ away from the third-party ethanol facilities.  However, significant terms—including pricing information—are redacted from the agreements in the record.  While SCS offered to provide the original documents for our review, after the issue came up in oral argument, we ultimately declined the offer, deciding to resolve the case on the record before us.

violated various county ordinances. In the meantime, beginning in June 2022, SCS began notifying landowners of its intent to conduct pre-condemnation surveys pursuant to SDCL 21-35-31 with or without landowner consent. Each of these notices contained a proposed date window for the survey, expressed a willingness to accommodate other dates more convenient to the landowner, and noted SCS's intention to "complete the survey work within 45-days following the 30-day written notice period."

[¶8.] According to SCS, three different types of surveys would be conducted along the pipeline route. The most common would be "minimally invasive, non-destructive inquiries to assess the land . . . involv[ing] the use of 'hand tools (e.g., spades, shovels, augers)'" that could result in "small soil disturbances at discrete locations." The second type—geotech surveys—would "assess underlying soil and rock conditions and 'utilize[] a track mounted drilling rig to create a small diameter hole into the soil to collect samples of subsurface soils and rocks.'" The small hole would be "backfilled with drill cuttings or with a cement/bentonite grout mixture." However, SCS claims there would be "no impact to normal land use after drilling is complete and the hole is backfilled."

[¶9.] Finally, "deep dig" surveys would be necessary for properties located within a floodplain to search for archaeological sites of cultural significance. These "involve the use of a backhoe to dig trenches typically 7 to 10 feet in length, 2 to 3 feet in width, and 6 to 10 feet deep." SCS committed that "[o]nce this deep testing survey work is completed, any trenches will be backfilled and the ground will be graded to near existing conditions." For all three survey types, SCS assured

landowners that resulting property damage would be repaired or reimbursed. To this end, SCS obtained a $1 million performance bond, which was later increased to $5 million.[2]

[¶10.]     Landowners refused to consent to the surveys and sued SCS in both the Third and Fifth Circuits. Two cases—*Strom* and *Deeg*—were brought in the Third Circuit, seeking declaratory and injunctive relief to prohibit SCS from conducting the surveys. The plaintiff Landowners in these cases alleged that SDCL 21-35-31 was unconstitutional under the takings and due process clauses of the federal and state constitutions. SCS counterclaimed, seeking declaratory judgment and injunctive relief recognizing its statutory right to conduct the surveys and prohibiting Landowners from interfering. The *Strom* and *Deeg* cases were consolidated, and Landowners submitted an amended complaint with six grounds for relief, arguing, among other things, that SDCL 21-35-31 violated the federal and state constitutions and that SCS was not a common carrier authorized to exercise the power of eminent domain.

[¶11.]     During discovery, Landowners moved to compel production of any offtake agreements between SCS and third-party entities for the transportation of $CO_2$. Landowners argued that these agreements were "critically important to the question of whether SCS is a common carrier" and thus entitled to exercise eminent domain power under SDCL 21-35-31. In response, SCS sought a protective order on

---

2.     It is unclear whether this sum is intended to cover damages exclusively in South Dakota or in all of the states potentially affected by the pipeline.

the basis that the agreements contained "extraordinarily confidential" terms and pricing information that if publicized would put SCS at a competitive disadvantage.

[¶12.]     The Third Circuit conducted an in-camera review of the agreements and granted SCS a protective order.[3]  In granting the protection order, the circuit court entered a memorandum decision on December 28, 2022, finding sua sponte that $CO_2$ was a commodity "regardless of the form of compensation, terms of payment, or transfer of value."  In addition, the court concluded that the agreements "establish that SCS is shipping carbon dioxide, belonging to the ethanol plants, for a fee."  The court also noted that the agreements were not relevant to the "primary" legal issue in the case, namely, the constitutionality of SDCL 21-35-31.

[¶13.]     In January 2023, SCS moved for summary judgment on all claims and counterclaims in the Third Circuit cases.  Landowners resisted this motion and moved to compel additional discovery and for a continuance of the motion for summary judgment to conduct additional discovery under SDCL 15-6-56(f).  After a hearing, the Third Circuit denied the motion to compel and for a continuance and granted SCS's motion for summary judgment.  Having sua sponte determined that SCS was a common carrier in its prior discovery ruling, the circuit court held that SDCL 21-35-31 was constitutional and that as a common carrier SCS was authorized by SDCL 21-35-31 to conduct its proposed surveys.

[¶14.]     Meanwhile, four cases—*Helfenstein*, *Braun*, *Schumacher*, and *Bossly*— were brought in the Fifth Circuit and consolidated.  These plaintiff Landowners also

---

3.     The agreements reviewed by the circuit court were not sealed and placed into the record for our review.

sought declaratory and injunctive relief based on grounds almost identical to those asserted by Landowners in their consolidated amended complaint filed in the Third Circuit. However, in a fifth case—*Jordre*—SCS sued Landowners for declaratory and injunctive relief for survey access. In *Jordre*, the defendant Landowners did not amend their counterclaim to match that of the other four cases. But Landowners filed a motion to compel, and SCS filed a motion for a protective order. The Fifth Circuit denied Landowners' motion to compel and granted SCS's motion for a protective order. SCS moved for summary judgment on all claims and counterclaims in February 2023, while Landowners sought a continuance under SDCL 15-6-56(f).

[¶15.] After a hearing, the Fifth Circuit denied the Rule 56(f) continuance and granted SCS's motion on all issues except for SCS's common carrier status. The court took this issue under advisement and ordered further briefing. After consideration of the parties' arguments the court ultimately concluded that SCS is a common carrier and adopted the reasoning of the Third Circuit court on this issue. Accordingly, the court granted summary judgment to SCS on all issues and authorized SCS to conduct the proposed surveys. Landowners appealed both the Third and Fifth Circuit rulings, and this Court granted Landowners' motion to consolidate the cases on appeal.[4] Landowners raise six issues, which we restate and reorder as follows:

---

4. After oral argument in this case, SCS moved to submit late authorities pursuant to SDCL 15-26A-73. Specifically, SCS requested that this Court consider *SCS Carbon Transportation v. Malloy*, in which the North Dakota

(continued . . .)

1. Whether the circuit courts erred by entering summary judgment concluding SCS was a common carrier vested with the power of eminent domain.

2. Whether the circuit courts erred by denying Landowners' motion to continue summary judgment for discovery purposes.

3. Whether the circuit courts erred by finding SDCL 21-35-31 authorized subsurface exploratory activities.

4. Whether the circuit courts erred by finding SDCL 21-35-31 is not a taking within the meaning of the Fifth Amendment to the United States Constitution and the South Dakota Constitution article VI, § 13.

5. Whether the circuit courts erred as a matter of law by concluding SDCL 21-35-31 provided adequate procedural due process.

6. Whether the circuit courts erred by finding SCS complied with the requirements of SDCL 21-35-31.

**Analysis**

[¶16.]     On March 11, 2024, SCS filed a motion to continue oral argument, suggesting that this appeal was moot because the Legislature amended the challenged provisions of SDCL 21-35-31, effective July 1, 2024.  However, several issues presented in this appeal—most prominently whether SCS is a common carrier and whether carbon is a commodity—do not turn on the text of SDCL 21-35-31 and are unaffected by any potential amendments to this statute.

[¶17.]     Nor do we perceive mootness associated with the bare fact that SDCL 21-35-31 has been amended and went into effect on July 1.  Prior to its enactment,

_____

(. . . continued)
        Supreme Court upheld the constitutionality of a statute similar to SDCL 21-35-31.  7 N.W.3d 268 (N.D. 2024).  We granted SCS's motion.

the previous version of the statute was used as authority by SCS to conduct pre-condemnation surveys. In fact, both the Third and Fifth Circuits *enforced* the earlier version of SDCL 21-35-31 by enjoining Landowners from preventing the pre-condemnation surveys. Amended statute or not, a declaration of rights under the earlier statute for pre-condemnation surveys remains very much a live controversy.

[¶18.] However, our analysis of SDCL 21-35-31 below should be understood as doing nothing more than interpreting the statute before us, not the current one that is in effect. Whether the recent amendments would impact the statute's constitutionality is a question for another day. We have not sought supplemental briefing on the constitutionality of the new statute and do not decide that question today.

[¶19.] Turning to the merits, we combine the first two issues because SCS can only exercise eminent domain authority pursuant to SDCL 21-35-31 if it qualifies as a common carrier and the circuit court's ruling on the discovery issues implicates that question.

### I. Whether the circuit courts erred by denying Landowners' motions to continue and by entering summary judgment concluding SCS was a common carrier vested with the power of eminent domain.

[¶20.] SCS claims eminent domain authority pursuant to SDCL 49-7-13. This statute grants eminent domain power to pipeline companies that meet the definition of common carrier set forth in SDCL 49-7-11: "All pipelines holding themselves out to the *general public* as engaged in the business of transporting *commodities for hire* by pipeline are common carriers and are not subject to the provisions of Title 49 except as provided by this chapter and chapter 49-41B."

(Emphasis added.) The Third Circuit determined, sua sponte, that SCS met this definition of common carrier. Landowners argue that the court erred because SCS's proposed pipeline will not truly be "for hire" and because $CO_2$ is not a commodity. Accordingly, in Landowners' view, SCS cannot properly claim eminent domain authority. In the second issue statement above, Landowners also argue that the Third and Fifth Circuits erred in denying their motions to continue summary judgment for further discovery on the common carrier issues.

### A. Summary judgment on the common carrier and commodity issues.

[¶21.]    "We review grants of summary judgment under the de novo standard of review." *Bialota v. Lakota Lakes, LLC*, 2024 S.D. 7, ¶ 15, 3 N.W.3d 454, 459 (citation omitted). "Summary judgment is only appropriate when the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits of the parties, reveal that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *McGee v. Spencer Quarries, Inc.*, 2023 S.D. 66, ¶ 18, 1 N.W.3d 614, 620 (citation omitted). "It is well-settled that '[w]e view the evidence most favorably to the nonmoving party and resolve reasonable doubts against the moving party.'" *Uhre Realty Corp. v. Tronnes*, 2024 S.D. 10, ¶ 41, 3 N.W.3d 427, 438 (alteration in original) (citation omitted).

[¶22.]    Landowners assert that the definition of common carrier in SDCL 49-7-11 is not met because the record does not demonstrate whether future third parties will actually be paying SCS to transport $CO_2$. Landowners specifically object to the Third Circuit's determination that "the nature of the payment or

transfer of value is not relevant or determinative of the fact that a fee exists."

Landowners also point out that under the terms of the offtake agreements in the

record, SCS will take title to the $CO_2$ as it enters the pipeline. According to

Landowners, SCS cannot be classified as transporting $CO_2$ for hire if it is

transporting its own $CO_2$. In addition, Landowners claim that because it is being

disposed of as waste, the $CO_2$ featured in this case is not a commodity.

[¶23.]     Landowners also suggest that this Court apply the test used by the

Texas Supreme Court to determine common carrier status:

> [F]or a person intending to build a $CO_2$ pipeline to qualify as a
> common carrier under Section 111.002(6), a reasonable
> probability must exist that the pipeline will at some point after
> construction serve the public by transporting gas for one or more
> customers who will either retain ownership of their gas or sell it
> to parties other than the carrier.

*Texas Rice Land Partners, Ltd. v. Denbury Green Pipeline-Texas, LLC*, 363 S.W.3d

192, 202 (Tex. 2012). Section 111.002(6) provides that an entity is a common carrier

if it "owns, operates, or manages, wholly or partially, pipelines for the

transportation of carbon dioxide or hydrogen in whatever form to or for the public

for hire." Tex. Nat. Res. Code § 111.002(6). This statute is largely equivalent to

SDCL 49-7-11, and we conclude that our statute—particularly the "for hire"

component—should be interpreted similarly.

[¶24.]     As this Court has previously stated, "[t]he power to take privately

owned property and put it to public use is 'an inherent right vested in a sovereign

state as a necessary attribute thereof.'" *Montana-Dakota Utils. Co. v. Parkshill

Farms, LLC*, 2017 S.D. 88, ¶ 7, 905 N.W.2d 334, 337 (quoting *Darnall v. State*, 79

S.D. 59, 63, 108 N.W.2d 201, 203 (1961)). The Legislature can delegate the power of

eminent domain to non-public corporations, such as utilities or pipelines, but the essential requirement of public use remains. Without it, a private enterprise could exercise the austere power of the State purely for its own private interests in contravention of federal and state constitutional takings clauses. *See Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245, 104 S. Ct. 2321, 2331, 81 L. Ed. 2d 186 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void.")

[¶25.] Consequently, the Legislature's decision to delegate the power of eminent domain to pipeline companies in SDCL 49-7-13 must be understood to require a public use that actually serves the public. The statute accounts for this by allowing pipeline companies to exercise the power of eminent domain if they are common carriers, which SDCL 49-7-11 defines as "[a]ll pipelines holding themselves out to the general public as engaged in the business of transporting commodities for hire by pipeline[.]"

[¶26.] But a pipeline cannot become a common carrier simply by declaring itself to be one. *See Denbury Green Pipeline-Tex., LLC v. Tex. Rice Land Partners, Ltd.*, 510 S.W.3d 909, 916 (Tex. 2017). Rather, as the Texas Supreme Court explained, to be a common carrier, the pipeline must serve the public, meaning "a reasonable probability must exist that the pipeline will at some point after construction serve the public by transporting gas for one or more customers who will either retain ownership of their gas or sell it to parties other than the carrier." *Texas Rice Land Partners*, 363 S.W.3d at 202.

[¶27.] According to Landowners, SCS cannot meet this test because there is no evidence that SCS is being paid to transport $CO_2$. Landowners persuasively suggest that SCS's business model is akin to that of a private carrier, where SCS ships its own $CO_2$ through its own transportation network to an underground storage facility.[5] Indeed, the redacted pricing terms are crucial to the summary judgment analysis regarding whether the $CO_2$ is being shipped to or for the general public. The record is not adequately developed concerning the details of the transactions and prices between SCS and the ethanol plants to affirm as a matter of law that SCS is "holding [itself] out to the general public as engaged in the business of transporting commodities for hire[.]" *See* SDCL 49-7-11.

[¶28.] SCS responds with four factual claims intended to establish its identity as a common carrier as a matter of law. First, SCS advertised its transportation services for hire to the general public and reached out directly to potential customers. Second, SCS expressed an intent to hold an open season where the general public can execute binding commitments for SCS's services. Third, SCS is reserving a portion of its pipeline capacity for future shippers. Fourth, SCS represented to the State of North Dakota that it will carry on business as a common carrier.

[¶29.] SCS is correct that "the concept of 'common carrier' must be flexible enough to accommodate reasonable commercial practice." *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 251 (3d Cir. 2007). However, none of the facts

---

5. Landowners note that SCS can then obtain a federal tax credit of $85 for each metric ton of $CO_2$ sequestered.

alleged above, even if true, would provide undisputed evidence of a "reasonable probability . . . that the pipeline will at some point after construction serve the public by transporting gas for one or more customers who will either retain ownership of their gas or sell it to parties other than the carrier." *See Texas Rice Land Partners*, 363 S.W.3d at 202. Here, there remain factual disputes regarding whether ethanol plants contracting with SCS will retain ownership of their $CO_2$ or sell it to parties other than SCS. Indeed, the unredacted offtake agreements may very well reveal that SCS is ultimately purchasing and taking ownership of the $CO_2$. In addition, it is undisputed that instead of being sold to parties other than the carrier, the $CO_2$ will be sequestered underground in North Dakota.

[¶30.] Based on the record before us, SCS has also failed to establish that the $CO_2$ featured in this case is a commodity. SCS notes that the federal government and several states, including Louisiana, Oklahoma, Mississippi, North Dakota, and Nebraska, classify $CO_2$ as a commodity. *See* 49 C.F.R. § 1039.11(a) ($CO_2$ is listed as a commodity by the Surface Transportation Board); La. Rev. Stat. § 30:1102(A)(2); Okla. Stat. tit. 27A, § 3-5-101(B)(1); Miss. Code Ann. § 53-11-3(1)(b); N.D. Cent. Code § 38-22-01; Neb. Rev. Stat. § 57-1602. SCS also suggests that $CO_2$-based products, from fertilizers to building blocks, could be worth up to $1 trillion by 2030. According to SCS, even $CO_2$ that is ultimately stored underground has value because of the carbon-offset markets and federal subsidies which are available to shippers and third-party facilities.

[¶31.] However, it is not at all apparent that $CO_2$, as featured in this case, meets the definition of a commodity: "[a]n article of trade or commerce" or "[a]n

-14-

economic good, esp. a raw material or an agricultural product." *Commodity*, Black's Law Dictionary (11th ed. 2019). Although $CO_2$ is used as a raw material in the manufacturing of numerous products,[6] Landowners correctly point out that the $CO_2$ at issue here is being transported for storage underground, with no other apparent use. As SCS's counsel acknowledged before this Court at oral argument, the classification of $CO_2$ as a commodity when it is being transported and sequestered underground is a novel question of first impression. Here, the record is simply devoid of any indication that $CO_2$ is being used in this context as an "article of trade or commerce" or being sold as an "economic good." Instead, it appears from our review of the record that the economic item of value at play here may be the tax credit generated by the sequestration of the $CO_2$, a determination which is driven by federal energy policies.

[¶32.]     In states where $CO_2$ is classified as a commodity, the legislatures have made a policy decision that $CO_2$ is a commodity due to its potential industrial applications, including the recovery of oil, gas, and other minerals. *See* La. Rev. Stat. § 30:1102(A)(2); Okla. Stat. tit. 27A, § 3-5-101(B)(1); Miss. Code Ann. § 53-11-3(1)(b); N.D. Cent. Code § 38-22-01; Neb. Rev. Stat. § 57-1602. The Legislature of South Dakota, however, has been silent on this particular subject. On the basis of an undeveloped record regarding pricing terms and business structure, we are unwilling to make such a significant determination, particularly one that is heavily bound up in policy considerations. On the limited factual record before us, SCS has

---

6.     Potential items that could be fabricated with $CO_2$ include proteins, polymers, foams, plastics, concrete, furniture, shatterproof glass, and fuel.

not demonstrated, as a matter of law in these summary judgment proceedings, a reasonable probability that the $CO_2$ being transported and sequestered in the case will be put to any productive use.

[¶33.]     Because the record, viewed most favorably to the Landowners, does not demonstrate that SCS is transporting a commodity for hire to or for the general public, the circuit courts erred in concluding that SCS is a common carrier pipeline authorized to exercise eminent domain authority.  We reverse the grant of summary judgment and remand for further proceedings.

### B.     Landowners' Motion for Further Discovery.

[¶34.]     Having reversed the circuit courts' orders for summary judgment determining that SCS qualified as a common carrier, it is necessary to address the issue of Landowners' motion for further discovery.  On December 28, 2022, the Third Circuit issued a memorandum decision granting SCS's motion for a protective order regarding certain information in the offtake agreements.  In its analysis, the circuit court found sua sponte that SCS qualified as a common carrier and that $CO_2$ was a commodity.  These findings were later adopted by the Fifth Circuit in its opinion granting summary judgment to SCS.  Landowners argue that the Third Circuit's sua sponte ruling was improper and that they should have been permitted further discovery.

[¶35.]     First, we must consider SCS's argument that the sua sponte common carrier determination is not properly before the Court.  According to SCS, the notice of appeal only included the Third Circuit's March 8, 2023 memorandum opinion granting summary judgment to SCS and not its earlier December 28, 2022 order, in

-16-

which the circuit court found that SCS was a common carrier. As a result, according to SCS, the sua sponte issue is not properly before this Court. However, in the March 8 opinion, the circuit court specifically referenced its reasoning in the December 28 order and, on this basis, disposed of the common carrier issues. We conclude that this matter is properly before us.[7]

[¶36.]    Regarding discovery, Landowners sought to conduct Rule 30(b)(6) depositions of SCS corporate designees and CEOs of SCS's affiliated ethanol plants. Since the inception of this litigation, Landowners have served SCS with five subpoenas and notices of depositions, beginning on September 22, 2022. *See* SDCL 15-6-30(b)(6). However, according to Landowners, SCS "failed to attend any of Landowners' noticed depositions, designate appropriate agents, [or] cooperate with Landowners to resolve" discovery disputes.

[¶37.]    On February 14, 2023, Landowners moved to compel discovery. Specifically, Landowners asked the Third Circuit to "enter[] an order compelling SCS to designate appropriate agents with knowledge regarding Landowner's noticed deposition topics . . . , directing SCS to make persons available for deposition on February 24, 2023 at 9:30 a.m. until fully answered, and an order compelling SCS to dutifully cooperate with South Dakota's discovery rules." Landowners argued to the court that these depositions would yield information relevant to SCS's common carrier status, compliance with SDCL 21-35-31, and

---

7.    "On appeal from a judgment the Supreme Court may review any order, ruling, or determination of the trial court, including an order denying a new trial, and whether any such order, ruling, or determination is made before or after judgment involving the merits and necessarily affecting the judgment and appearing upon the record." SDCL 15-26A-7.

SCS's ability to compensate Landowners for any actual damage. Landowners proposed the following deposition topics:

1. The general background and ownership of SCS Carbon Transport, LLC, and nature and type of business services you offer and desire to provide within South Dakota and your overall business plan.

2. The final version of any prospectus, private placement memorandum, proformas or similar that in any way describes your business model or business plan.

3. The contents and meaning of any executed agreement, contract, or letter of intent of any kind [ ] between you or any of your related entities and/or and carbon dioxide emitter, including but not limited to "offtake agreement", located in the State of South Dakota who produces any carbon dioxide that you intend to transport via pipeline within South Dakota.

4. The ownership of the carbon dioxide you intend to transport through your proposed pipeline within South Dakota at each stage from initial emissions to final placement or use and how the carbon dioxide you propose to transport within South Dakota is to be used or permanently sequestered and by whom.

5. The kind nature and type of examinations, surveys, and maps thereof you believe you are allowed to conduct upon, in, or under any of the land at issue in these consolidated proceedings and whether or not the land of each and every landowner in these consolidated cases that you seek to survey, examine, and/or map is required by you for public use and if so, how so and why.

6. Your procedures and criteria for determining damages to all landowners in these consolidated cases should injury to their property be caused by you or your agents in their attempt or pursuit of examining, surveying, or mapping such properties.

7. Your "new" Survey Permit Performance Bond.

8. The facts supporting your claims that you are a "common carrier" in South Dakota and the facts supporting your

claims that your proposed hazardous pipeline is for public use within South Dakota.

9. Your paragraphs 1 through 12 of your Counterclaim and the facts you rely upon to make said claims.

10. Your summary judgment evidence.

[¶38.] In a separate brief resisting summary judgment, also dated February 14, 2023, Landowners renewed their previous requests for "full unredacted versions of all documents produced to date." According to Landowners, the redacted portions "are believed to contain material information." However, on March 15, 2023, the Third Circuit granted SCS's motion for summary judgment and denied Landowners' request for further discovery. Shortly thereafter, the Fifth Circuit granted SCS's motion for summary judgment and denied a similar motion to continue from Landowners.

[¶39.] "Sua sponte orders of summary judgment will be upheld only when the party against whom judgment will be entered was given sufficient notice and an adequate opportunity to demonstrate why summary judgment should not be granted." *Brown v. Hanson*, 2007 S.D. 134, ¶ 19, 743 N.W.2d 677, 682. "SDCL 15-6-56(f) authorizes a court to order a continuance to permit a party opposing summary judgment to conduct discovery when necessary to oppose the motion." *Gores v. Miller*, 2016 S.D. 9, ¶ 14, 875 N.W.2d 34, 39. "A circuit court's decision to grant or deny a continuance under Rule 56(f) is reviewed for an abuse of discretion." *Davies v. GPHC, LLC*, 2022 S.D. 55, ¶ 51, 980 N.W.2d 251, 265.

[¶40.] "Under [Rule 56(f)], the facts sought through discovery must be 'essential' to opposing the summary judgment[.]" *Stern Oil Co. v. Border States*

-19-

*Paving, Inc.*, 2014 S.D. 28, ¶ 26, 848 N.W.2d 273, 281 (alterations in original) (citation omitted). "This requires a showing how further discovery will defeat the motion for summary judgment." *Id.* (citation omitted). "To make this showing, the Rule 56(f) affidavit must include identification of 'the probable facts not available and what steps have been taken to obtain' those facts, 'how additional time will enable [the nonmovant] to rebut the movant's allegations of no genuine issues of material fact[,]' and 'why facts precluding summary judgment cannot be presented' at the time of the affidavit." *Id.* ¶ 26, 848 N.W.2d at 282 (alterations in original) (quoting *Anderson v. Keller,* 2007 S.D. 89, ¶ 32, 739 N.W.2d 35, 43 (Zinter, J., concurring)).

[¶41.] In their Rule 56(f) affidavit, Landowners' attorney explained how the proposed deposition topics would uncover facts necessary to oppose summary judgment:

- Deposition Topics #1, 2, 3, 4 and 8 would uncover specific facts about SCS's pricing scheme, whether their service or operation is available for the public to freely use or is exclusively meant to serve private entities, how their operation conducts business with the public, how carbon is being used, for what purpose it is being transported, who is benefiting from the use of SCS's service or operation, and who owns the carbon dioxide at every stage of its use. I believe these facts would refute SCS's Motion for Summary Judgment on the claims of whether SCS qualifies as a common carrier and whether carbon dioxide qualifies as a commodity.

- Deposition Topics #5, 6, and 7 would uncover specific facts about SCS's intentions with land owned by Landowners, what extent SCS's surveys and related activities will damage the Landowners' property, why these activities are needed, why SCS wants to conduct these activities when they are not required for permitting, why SCS does not want to comply with SDCL Chapter 21-35 in their pursuit to condemn

Landowners' lands, whether there is a means reasonably and rationally calculated to determining the appropriate compensation for SCS's damage to Landowner's property, whether SCS's survey bond is sufficient to compensate all of the Landowners who experience damage to their land, whether this process is fair, how Landowners can appeal SCS's assessed damage value, and when Landowners can expect compensation for their [assessed] damage to their land. I believe these facts would refute SCS's Motion for Summary Judgment on the claims of whether SCS has performed a taking and if SCS's compensation scheme appropriately aligns with due process requirements, whether their survey actions exceed that which is statutorily authorized, whether SCS is violating Landowners' constitutional rights, and whether SCS qualifies as a common carrier.

- Deposition Topics #9 and 10 would uncover specific facts about whether SCS has meritorious arguments and evidence supporting their counter claims and their Motion for Summary Judgment. . . .

[¶42.] These assertions are sufficient for purposes of a continuance to engage in discovery under Rule 56(f), especially in light of SCS's significant resistance to Landowners' discovery and deposition requests. Ultimately, discovery regarding SCS's payments and other arrangements with third-party facilities to transport $CO_2$ is crucial to determine whether SCS is shipping a commodity for hire to or for the general public. In addition, much of the information sought through the depositions—and certainly the redacted pricing terms from the offtake agreements—is within the exclusive control of SCS. This weighs strongly in favor of granting Landowners' further discovery, contrary to the determinations by the circuit courts that the information sought by Landowners has no bearing on any of the issues in the case. Thus, we conclude that the circuit courts abused their

discretion in denying Landowners' motion to continue and by precluding Landowners from conducting further discovery.

## II.    The Scope and Constitutionality of SDCL 21-35-31.

[¶43.]    Our decision to reverse entry of summary judgment on the common carrier issues resolves a threshold issue in this appeal, but we conclude that it is appropriate to address the questions concerning the scope and constitutionality of SDCL 21-35-31 to provide clarity and avoid protracted litigation on remand if SCS is determined to be a common carrier.  The parties have fully briefed and argued these purely legal questions involving SDCL 21-35-31, and on remand, the parties will undoubtedly continue to contest the takings issues, which are squarely before us.  Thus, we conclude a resolution of these issues will promote judicial efficiency, irrespective of the ultimate resolution of the common carrier issues on remand.  *See Dakota, Minnesota & Eastern R.R. Corp. v. Acuity*, 2009 S.D. 69, ¶ 33, 771 N.W.2d 623, 633 (considering whether certain conduct during litigation could be introduced as further evidence of bad faith because "the issue [was] likely to arise on remand"); *Stern Oil Co. v. Brown*, 2018 S.D. 15, ¶ 42, 908 N.W.2d 144, 157 (addressing whether Stern Oil was not a prevailing party entitled to attorney fees—an "arguably moot" issue—"to provide the circuit court and parties with guidance" if the issue arises again on remand).

[¶44.]    To be clear, we make no judgment as to SCS's ultimate common carrier status, and only address the following issues to provide clarity on remand.

> ### A. Whether the circuit courts erred by finding SDCL 21-35-31 authorized subsurface exploratory activities.

[¶45.]     "We review issues of statutory interpretation de novo." *State v. Long Soldier*, 2023 S.D. 37, ¶ 11, 994 N.W.2d 212, 217. "The rules of statutory interpretation are well settled." *Id.* (citation omitted). "The purpose of statutory interpretation is to discover legislative intent." *Id.* (citation omitted). "[T]he starting point when interpreting a statute must always be the language itself." *Id.* (alteration in original) (citation omitted). "When the language in a statute is clear, certain, and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed." *Id.* (citation omitted). "In conducting statutory interpretation, we give words their plain meaning and effect, and read statutes as a whole." *Id.* (citation omitted).

[¶46.]     SDCL 21-35-31, prior to July 1, 2024, provided:

> The provisions of this section only apply to a project which requires a siting permit pursuant to chapter 49-41B. Each person vested with authority to take private property for public use may cause an examination and survey to be made as necessary for its proposed facilities. The person or person's agents and officers may enter the private property for the purpose of the examination and survey. Any person seeking to cause an examination or survey, where permission for examination or survey has been denied, shall:
>
> 1) Have filed a siting permit application with the Public Utilities Commission pursuant to § 49-41B-11;
> 2) Give thirty days written notice, including the filing and expected dates of entry, to the owner and any tenant in possession of the private property; and
> 3) Make a payment to the owner, or provide sufficient security for the payment, for any actual damage done to the property by the entry.

> This section does not apply to the state or its political divisions. This section is in addition to and not in derogation of other existing law.[8]

[¶47.] Landowners assert that SCS's proposed survey activities, including the use of hand tools, mounted drilling rigs, and backhoes, go beyond this statutory authorization. SCS responds that the "ordinary meaning" of "examination" and "survey" includes both "visual" and "physical" examination. SCS points to a recent decision of the North Dakota Supreme Court, which held that "[t]he definition of 'examination' is not strictly limited to a visual examination." *In re 2015 Application for Permit to Enter Land*, 883 N.W.2d 844, 849 (N.D. 2016) (relying on the definition of "examination" from the Webster's New World Dictionary (2d coll. ed. 1980)).

[¶48.] However, any such interpretative proposition must be weighed against the fundamental principle—espoused by the vast majority of states—that eminent domain statutes are strictly construed in favor of the property owner. *See Clarke Cnty. Reservoir Comm'n v. Robins*, 862 N.W.2d 166, 171 (Iowa 2015) ("Statutes that delegate the power of eminent domain should be strictly construed and restricted to their expression and intention."); *see also* Dana Berliner, Am. Law Inst. Continuing Legal Ed., *Strict Construction in Eminent Domain Statutes*, SZ005 ALI-CLE 287

---

8. The textual authority for pre-condemnation surveys remains the same in both the current and previous versions of SDCL 21-35-31—"Each person vested with authority to take private property for public use may cause an examination and survey to be made as necessary for its proposed facilities." The current version, however, also includes a definition or description of the terms "examination" and "survey." But, as indicated above, we are interpreting the previous version of SDCL 21-35-31 because it was used to authorize the pre-condemnation surveys undertaken to date. The effect, if any, of the Legislature's new text concerning "examination" and "survey" is not before us here.

(Jan. 2018) (excerpting state jurisprudence concerning the interpretation of eminent domain statutes). As this Court previously stated, "[p]roceedings to take private property by condemnation are special in character and must be conducted in strict accordance with governing statutes." *Ehlers v. Jones*, 81 S.D. 351, 353, 135 N.W.2d 22, 23 (1965).

[¶49.] Now, "[c]ourts have typically defined a survey as the measurement of land." 9 *Nichols on Eminent Domain* § G32.06. For example, in *Missouri Highway and Transportation Commission v. Eilers*, the Missouri Court of Appeals explained that "[a] survey is 'an actual examination of the surface of the ground[,]'" and "'merely evidence of location and boundary.'" 729 S.W.2d 471, 473 (Mo. Ct. App. 1987) (citation omitted). Thus, a "soil survey"—involving the use of a three-inch auger to remove soil for testing—would go beyond the strict meaning of "survey." *Id.* at 472. Similarly, in *Mackie v. Town of Elkton*, a Maryland court defined survey entries as those that "are innocuous and temporary effecting only minimal incidental damage and little, if any, disturbance." 290 A.2d 500, 505 (Md. 1972). As a result, the court held that the use of a backhoe to conduct geological investigations did not fall within this definition. *Id. See also Nat'l Compressed Steel Corp. v. Unified Gov't of Wyandotte Cnty.*, 38 P.3d 723, 735 (Kan. 2002) (holding that "subsoil testing is beyond the scope of the examination authorized" by a Kansas pre-condemnation survey provision); *Indiana State Highway Comm'n v. Ziliak*, 428 N.E.2d 275, 279 (Ind. Ct. App. 1981) (concluding that the "right to enter private property for the purpose of examination and survey confers no license to engage in the process of conducting archaeological digs").

[¶50.]    Nevertheless, SCS proposes that "survey" and "examination" should be understood as "[t]he measuring of a tract of land and its boundaries and *contents*." *Survey*, Black's Law Dictionary (11th ed. 2019) (emphasis added). But even this definition is somewhat ambiguous as "contents" could very well refer to aboveground, as opposed to subsurface, features of the property. In any event, SCS's reading of the statute would authorize any number of invasive activities directly at odds with the owner's right to possess their property. In light of the near-universal consensus in favor of strict construction, we decline to adopt such a broad interpretation of SDCL 21-35-31.

[¶51.]    Furthermore, if fairly possible, we will adopt a construction of the statute that avoids constitutional infirmities. *Steinkruger v. Miller*, 2000 S.D. 83, ¶ 8, 612 N.W.2d 591, 595. For the reasons previously expressed, SCS's proposed "geotech" and "deep dig" surveys would constitute takings under both the federal and state constitutions, rendering SDCL 21-35-31, as interpreted by SCS, unconstitutional because the scope of the survey or examination exceeds the common law definition we would ascribe to it.

[¶52.]    Instead, we conclude that "survey" and "examination," in the context of SDCL 21-35-31, "cannot amount to other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps and as would not in the nature of things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property[.]" *Kane Cnty. v. Elmhurst Nat'l Bank*, 443 N.E.2d 1149, 1154 (Ill. App. Ct. 1982). We will refer herein to such a minimally invasive inspection as a "standard survey." Accordingly, we hold that the "geotech"

and "deep dig" activities, involving heavy equipment for invasive drilling and digging, do not qualify as a "survey" or "examination." We turn now to the question whether SDCL 21-35-31, as interpreted herein, constitutes a taking under the federal and state constitutions.

> **B.** ***Whether the circuit courts erred by finding SDCL 21-35-31 is not a taking within the meaning of the Fifth Amendment to the United States Constitution and the South Dakota Constitution article VI, § 13.***

[¶53.] "[T]his Court reviews de novo issues of constitutional interpretation." *Dakota Constructors, Inc. v. Hanson Cnty. Bd. of Adjustment*, 2023 S.D. 38, ¶ 12, 994 N.W.2d 222, 227. "When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted." *McDonald v. City of Chicago*, 561 U.S. 742, 828, 130 S. Ct. 3020, 3072, 177 L. Ed. 2d 894 (2010) (Thomas, J., concurring in part). When the original meaning is unclear, it can be discerned from "[t]he historical context of a constitutional provision," including constitutional debates and case law. *Doe v. Nelson*, 2004 S.D. 62, ¶ 10, 680 N.W.2d 302, 305–06.

[¶54.] Landowners argue that SDCL 21-35-31 authorizes an impermissible taking of private property without just compensation under both the federal and state constitutions. United States Constitution amendment V provides that:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law;

> *nor shall private property be taken for public use, without just compensation.*

(Emphasis added.)  South Dakota Constitution article VI, § 13 provides that:

> Private property shall not be taken for public use, or damaged, without just compensation, which will be determined according to legal procedure established by the Legislature and according to § 6 of this article.  No benefit which may accrue to the owner as the result of an improvement made by any private corporation shall be considered in fixing the compensation for property taken or damaged.  The fee of land taken for railroad tracks or other highways shall remain in such owners, subject to the use for which it is taken.

[¶55.]    We have determined that the South Dakota provision "provides greater protection . . . than the United States Constitution because our Constitution requires that the government compensate a property owner not only when a taking has occurred, but also when private property has been damaged."  *State ex rel. Dep't of Transp. v. Miller*, 2016 S.D. 88, ¶ 39, 889 N.W.2d 141, 153 (internal quotation marks omitted).  To preserve this distinction, we analyze both constitutional provisions separately.

*The Federal Takings Clause*

[¶56.]    According to Landowners, SDCL 21-35-31 violates the Federal Takings Clause by authorizing pre-condemnation surveys, which, in their view, amount to a per se physical taking of their right to exclude.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982) (holding that a permanent physical occupation constitutes a taking).  Landowners argue that the Supreme Court broadened per se physical takings to include "temporary or intermittent" invasions of private property, such as the surveys found in SDCL 21-35-31.  *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 141 S. Ct.

2063, 2071, 210 L. Ed. 2d 369 (2021). *See also Ehlebracht v. Crowned Ridge Wind II, LLC*, 2022 S.D. 19, ¶ 39, 972 N.W.2d 477, 489–90 (discussing four possible theories of a takings claim).

[¶57.]     SCS responds that "longstanding restrictions on property rights—like the right to survey access—are not takings." SCS points out that, in *Cedar Point*, the Supreme Court specifically stated that "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights." *Id.* at 160, 141 S. Ct. at 2079. Nevertheless, Landowners contend that pre-condemnation surveys are not part of South Dakota's legal tradition or common law and thus do not fall within this exception.

[¶58.]     To analyze these competing arguments, we turn first to *Cedar Point*. In that case, the Supreme Court was confronted with a statute that "grant[ed] union organizers a right to physically enter and occupy [agricultural employers'] land for three hours per day, 120 days per year." *Id.* at 149, 141 S. Ct. at 2072. The Court held that "[t]he access regulation appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking." *Id.* Central to this holding, the Court concluded that "physical invasions constitute takings even if they are intermittent as opposed to continuous." *Id.* at 153, 141 S. Ct. at 2075. However, the Court qualified its reasoning with three exceptions: 1) "Isolated physical invasions, not undertaken pursuant to a granted right of access"; 2) Government-authorized physical invasions consistent with longstanding background restrictions

on property rights; and 3) Property rights ceded as a condition of receiving government benefits. *Id.* at 159–61, 141 S. Ct. at 2078–79.

[¶59.] Here, SDCL 21-35-31 does grant a right of access for survey purposes to "[e]ach person vested with authority to take private property for public use[.]" Although such access has certain statutory limitations, including a required 30-day notice specifying the expected dates of entry, it nonetheless constitutes a taking of the Landowners' right to exclude—"one of the most treasured" rights of property ownership. *See Loretto*, 458 U.S. at 435, 102 S. Ct. at 3176. The question thus becomes whether a pre-condemnation survey access falls under one of the *Cedar Point* exceptions.

[¶60.] As an initial matter, it is evident that only the second exception could apply to SDCL 21-35-31 for a party vested with authority to take private property since survey access does not constitute a trespassory taking or a ceded property right. Landowners suggest this inquiry should focus on citizens' historic understandings "regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they take title to property." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1004, 112 S. Ct. 2886, 2888, 120 L. Ed. 2d 798 (1992).

[¶61.] However, even through this lens, pre-condemnation "standard surveys" are firmly established in the legal tradition of South Dakota in a variety of contexts. For at least a century, South Dakota statutes have granted condemnors the right to conduct pre-condemnation surveys. *See* SDCL 49-33-6 (in effect since 1903 and granting corporations the right to conduct pre-condemnation surveys for the

selection of electric light, street railroad, or power line); SDCL 50-6A-19 (regional airport authorities); SDCL 46A-6-5 (irrigation districts); SDCL 46-8-2.1 (water works). Landowners are correct that "[a] law does not become a background principle for subsequent owners by enactment itself." *Palazzolo v. Rhode Island*, 533 U.S. 606, 630, 121 S. Ct. 2448, 2464, 150 L. Ed. 2d 592 (2001).

[¶62.] However, in 1916, this Court held that surveys made "prior to or pending condemnation proceedings . . . certainly did not amount to taking possession of the tract." *Fairmont & V. Ry. Co. v. Bethke*, 37 S.D. 446, 449–50, 159 N.W. 56, 58 (1916). In addition, a jurist previously serving in the Second Circuit court recently recognized a South Dakota common law survey right incident to eminent domain. *See Dakota Access, LLC v. Schumaker*, No. 49CIV15-000941, Mem. Op. at 16–17 (S.D. Cir. Ct. Mar. 24, 2016). This is evident because "the right of eminent domain is virtually useless to an entity without the right to survey" prior to condemnation. *Id.* at 17 (quoting *State v. Crouch*, 621 S.W.2d 47, 48 (Mo. 1981)).

[¶63.] SCS also directs our attention to several relevant secondary sources. The Restatement of Torts explains that,

> [t]he privilege of entry for the purpose of performance or exercise of such duty or authority may be specifically given, as where an employee of a public utility is in terms authorized to enter upon privately owned land for the purpose of making surveys preliminary to instituting a proceeding for taking by eminent domain.

Restatement (Second) of Torts § 211 cmt. c. The Model Code on Eminent Domain reflects a similar understanding:

> The owner shall not obstruct a condemnor from entering upon his land prior to filing a declaration of taking for the purpose of surveying the land or making a specified inspection of same,

> provided that, the condemnor shall compensate the owner for any virtual damages that may result from his entrance upon the land.

10 *Nichols* Appendix D-2 § 308. Even more on point, *Nichols on Eminent Domain* states that "[e]ntry by a government agency for purposes of conducting a [standard survey] generally does not constitute a taking, under either the common law or under applicable statutory guidelines." 2A *Nichols on Eminent Domain* § 6.01(16)(b) (2022).

[¶64.]    Other states have also adopted similar interpretations. As noted by an Illinois Appellate Court, the "vast majority of jurisdictions have held that a prior condemnation suit is not a prerequisite to an entry on the lands of another for preliminary exploration and survey purposes." *Kane Cnty.*, 443 N.E.2d at 1153. "These courts have recognized a basic conceptual difference between a preliminary entry and a constitutionally compensable taking or damaging of property and have held that because the former is not a variety of the latter, it does not require adherence to condemnation procedures and constitutional provisions for just compensation." *Id.* (citing *Orange Water and Sewer v. Est. of Armstrong*, 237 S.E.2d 486, 487 (N.C. Ct. App. 1977); *San Luis Obispo v. Ranchita Cattle Co.*, 94 Cal. Rptr. 73 (Cal. Ct. App. 1971); *Litchfield v. Bond*, 78 N.E. 719, 732 (N.Y. 1906); *Carlisle v. Dep't of Pub. Utils.*, 234 N.E.2d 752 (Mass. 1968)).

[¶65.]    We thus conclude that the right to conduct pre-condemnation surveys is a longstanding background restriction on property rights. However, the scope of such surveys is limited. Indeed, we must "pause" when the proposed survey activities contemplate "a more invasive impact on individual property rights."

*Dakota Access*, No. 49CIV15-000941, Mem. Op. at 14. In *Missouri Highway*, the soil survey was a taking because it "subvert[ed] [the landowner's] right to use and enjoy his property in fee simple absolute." 729 S.W.2d at 473. As an Illinois Appellate Court reasoned, "the right of entry does not include the right to make a permanent appropriation or cause more than minimal or incidental damage to property[.]" *Kane Cnty.*, 443 N.E.2d at 1154.

[¶66.] We agree with these holdings and conclude that the circuit courts partially erred in their takings analyses. Here, SCS seeks to conduct not just superficial measurements, but also invasive geotech and deep-dig surveys. These latter activities will involve the use of heavy equipment and substantial disturbance of the Landowners' property. In the case of geotech surveys, the resulting holes will be filled with "drill cuttings or with a cement/bentonite grout mixture" resulting in a permanent physical occupation of a portion of Landowners' property, which undeniably constitutes a taking. *See Loretto*, 458 U.S. at 427, 102 S. Ct. at 3171. Geotech and deep-dig surveys—and other similarly invasive activities—thus do not fall into the second *Cedar Point* exception and constitute takings under the federal constitution.

[¶67.] Importantly, however, because we have previously concluded that the definition of "survey" and "examination" in SDCL 21-35-31 does not include geotech or deep-dig activities, the statute, properly interpreted, remains constitutional. As discussed above, the pre-condemnation survey authorization in SDCL 21-35-31 "cannot amount to other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps and as would not in the nature of

things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property[.]"[9] *See Kane Cnty.*, 443 N.E.2d at 1154 (citation omitted). This limited interpretation of pre-condemnation surveys comports with longstanding background restrictions on property rights and does not constitute a taking under the federal constitution.

*The State Takings Clause*

[¶68.] Turning to our state constitution, South Dakota Constitution article VI, § 13 provides that "[p]rivate property shall not be taken for public use, or damaged, without just compensation[.]" This provision requires compensation when "state conduct has infringed a recognized property interest." *Schliem v. State ex rel. Dep't of Transp.*, 2016 S.D. 90, ¶ 24, 888 N.W.2d 217, 231. As stated above, the South Dakota Constitution provides greater protection for property rights than does the federal constitution. *Miller*, 2016 S.D. 88, ¶ 39, 889 N.W.2d at 153. However, the three exceptions in *Cedar Point* remain relevant to the determination of what constitutes "a recognized property interest." *Schliem*, 2016 S.D. 90, ¶ 24, 888 N.W.2d at 231.

[¶69.] As we have already discussed, limited superficial surveys prior to condemnation are a longstanding background restriction on property. In other words, owners take real property subject to a historical understanding that government may access the property for survey purposes incidental to the power of

---

9.  To be clear, this means that condemnors may only conduct minimally invasive superficial inspections that will result in, at most, minor soil disturbances.

eminent domain. Thus, surveys conducted pursuant to SDCL 21-35-31, as interpreted above, do not result in a taking of a recognized property interest.

[¶70.] Landowners also argue that SDCL 21-35-31 violates the constitutional requirement that "just compensation" be determined by a jury. We have already determined that because SDCL 21-35-31 only authorizes standard surveys involving the most minimal of subsurface invasions, no taking has occurred in this case. Therefore, neither the state nor federal constitutions require that Landowners receive just compensation for SCS's right of entry as permitted by the statute. However, South Dakota Constitution article VI, § 13 also requires "just compensation" when private property is *damaged*. In addition, Article XVII, § 18 provides that:

> Municipal and other corporations and individuals invested with the privilege of taking property for public use shall make just compensation for property taken, injured or destroyed, by the construction or enlargement of their works, highways or improvements, which compensation shall be paid or secured before such taking, injury or destruction. The Legislature is hereby prohibited from depriving any person of an appeal from any preliminary assessment of damages against such corporation or individuals made by viewers or otherwise; and the amount of such damages in all cases of appeal shall, on the demand of either part, be determined by a jury as in other civil cases.

This section is directly applicable because SCS claims to be a corporation vested with the power of eminent domain.

[¶71.] Read together, these constitutional provisions require condemnors to provide "just compensation" for any damage or injury to property that occurs as a result of their government-sanctioned entry. To be clear, damage or injury does not include the value of the right of entry for standard surveys as defined herein which,

as we have already explained, are not takings of any compensable property interest. Damage refers solely to those injuries which are beyond the "innocuous entry and superficial examination" necessary to complete the standard survey. *Kane Cnty.*, 443 N.E.2d at 1154. Notwithstanding these limitations, even if SCS only performs standard surveys as authorized by SDCL 21-35-31, any resulting actual damage— for example damage to crops or a cut fence that allows cattle to escape—must be justly compensated.

[¶72.]    In addition, South Dakota Constitution article XVII, § 18 guarantees Landowners the right to appeal "from any preliminary assessment of damages" and have the final amount of damages determined by a jury. SDCL 21-35-31 requires SCS to "[m]ake a payment to the owner, or provide sufficient security for the payment, for any actual damage done to the property by the entry." However, the statute is silent as to whether a determination of damages under this provision can be appealed or submitted to a jury.

[¶73.]    Nevertheless, SDCL 21-35-31 also contains language providing that "[t]his section is in addition to and not in derogation of other existing law." We therefore conclude that SDCL 21-35-31 does not, nor could it, displace the constitutional guarantee of a right to appeal and a jury determination of damages where the SCS surveys cause actual damage. Landowners suggest that damages must be either paid or secured before the damage occurs. Although this is a correct reading of Article XVII, § 18, SDCL 21-35-31 comports with this requirement. In conclusion, SDCL 21-35-31, as strictly interpreted herein, does not violate the state constitution.

### C.    Whether the circuit courts erred as a matter of law by concluding SDCL 21-35-31 provided adequate procedural due process.

[¶74.]    Landowners next argue that SDCL 21-35-31 violates the due process clause by taking their private property without adequate procedural due process. This argument appears premised on the idea that the pre-condemnation surveys authorized by SDCL 21-35-31 constitute a taking.  However, based on our conclusion that SDCL 21-35-31 does not deprive Landowners of a protected property interest because pre-condemnation standard surveys are a longstanding background restriction on property rights, no protected property interest is infringed by the statute.  In addition, Landowners' ability to obtain just compensation through condemnation proceedings and a jury determination of any damages provides adequate due process protections.

### D.    Whether the circuit courts erred by finding SCS complied with the requirements of SDCL 21-35-31.

[¶75.]    Because summary judgment was not appropriate in this case and given the limited opportunity for discovery, we decline to address whether SCS complied with the requirements of SDCL 21-35-31.

## Conclusion

[¶76.]    We hold that on this record the circuit courts erred in granting summary judgment because SCS has not demonstrated that it is a common carrier holding itself out to the general public as transporting a commodity for hire.  The circuit courts also erred in denying Landowners' motions to continue because further discovery was central to Landowners' ability to resist summary judgment. Landowners are entitled to additional discovery within the scope of SDCL 15-6-26,

including depositions and the production of unredacted documents related to SCS's offtake agreements and business model under terms prescribed by the courts.

[¶77.] In order to provide clarity on remand, we also determine that SDCL 21-35-31 only authorizes limited pre-condemnation standard surveys, as defined herein. As a result, we conclude that this statute, as strictly interpreted herein, is constitutional under the takings and due process clauses of the state and federal constitutions because limited pre-condemnation standard surveys are a longstanding background restriction on property rights. In addition, SDCL 21-35-31, read in conjunction with South Dakota Constitution article XVII, § 18, guarantees a jury determination of any damages caused during the surveys and thus comports with South Dakota's unique constitutional guarantees regarding property rights.

[¶78.] We reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

[¶79.] JENSEN, Chief Justice, and SALTER and MYREN, Justices, and WIPF PFEIFLE, Retired Circuit Court Judge, concur.

[¶80.] WIPF PFEIFLE, Retired Circuit Court Judge, sitting for DEVANEY, Justice, who deemed herself disqualified and did not participate.